**BODDIE–NOELL ENTERPRISES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 579–88T.

United States Court of Federal Claims.

Nov. 4, 1996.

Thomas W. Power, Arlington, VA, attorney of record for plaintiff, with whom was Tracy J. Power, of counsel.

Steven I. Frahm, Claims Court Section, Tax Division, Department of Justice, Washington, D.C., with whom were Mildred L. Seidman and The Assistant Attorney General, attorneys of record for defendant.

## OPINION

HORN, Judge.

### FACTS

This case comes before the court for decision following a five day trial. In its complaint, the plaintiff, Boddie–Noell Enterprises, Inc. (Boddie–Noell), stated that it seeks a refund of federal taxes paid for the taxable years 1978 and 1979, pursuant to 28 U.S.C. § 1491 (1988) and the investment tax credit provisions in the Internal Revenue Code (I.R.C.),[1] "particularly sections 36[2] and 46–48...."

The undisputed basic facts of the case follow, although additional factual findings of the court on relevant details concerning individual restaurant units will be addressed below during the DISCUSSION section of this opinion. Boddie–Noell is a corporation with its principal place of business in Rocky Mount, North Carolina. Boddie–Noell filed its federal income tax returns on the basis of a fiscal year ending September 30 for the years 1978 and 1979. During the fiscal years ending September 30, 1978 (FYE 1978) and September 30, 1979 (FYE 1979), the two years at issue in the instant case, plaintiff owned and operated approximately two-hundred and forty (240) Hardee's restaurants in Virginia and North Carolina, pursuant to franchise agreements with Hardee's Food Systems, Inc. During the years at issue, Boddie–Noell constructed a number of new restaurant units and remodeled others.

Plaintiff filed federal income tax returns for FYE 1978 in June 1979, and for FYE 1979 in June 1980. On its returns, plaintiff claimed investment tax credits for the cost of a variety of assets, including items it alleges were constructed or installed at its restaurants. After an audit, by letter dated April 20, 1982, the Internal Revenue Service (IRS) proposed the disallowance of investment tax credits for some of the assets plaintiff claimed at its restaurants. In September, 1982, plaintiff filed a formal "Protest" to dispute the IRS audit determinations, including those which disallowed investment tax credit claims. The IRS denied Boddie–Noel's protest. Plaintiff, thereafter, paid all of the assessed disputed tax and filed timely claims for refund for FYE 1978 and FYE 1979 with the IRS in August 1986.

In its claim for refund for FYE 1978, plaintiff sought a refund of $58,235.68, based on $582,356.75 in claimed investment tax credit eligible expenditures at its restaurants for that year. In its claim for refund for FYE 1979, plaintiff sought a refund of $60,547.15, based on $605,471.54 in claimed investment tax credit eligible expenditures at its restaurants for that year. The IRS disallowed plaintiff's claims for refund for FYE 1978 and FYE 1979 by letters dated October 31, 1986, and October 8, 1986, respectively. Thereafter, plaintiff filed a timely complaint in this court on October 4, 1988.

Before the court are claims for investment tax credits for FYE 1978 at the following nine, then newly constructed, restaurant units:

Gastonia—Unit 1051

---

1. References to the Internal Revenue Code (I.R.C.) are to Title 26 of the United States Code. In addition, references to the Treasury Regulations are to Title 26 of the Code of Federal Regulations.

2. Although plaintiff partially relies on I.R.C. § 36 in its complaint, the court notes that I.R.C. § 36 was repealed by Pub.L. No. 95–30, Title I, § 202(d)(3), 91 Stat. 133 (1977). The repeal was effective to taxable years beginning after December 31, 1976.

Tower Shopping Center—Unit 1441

Bessemer City—Unit 1531

Gastonia 321 N—Unit 1551

Hillsborough—Unit 1561

South Boston—Unit 2041

Mercury Blvd.—Unit 2611

Hopewell # 2—Unit 2621

Fairfield Plaza—Unit 2631

Plaintiff dropped its entire claim for FYE 1978 for investment tax credits for one newly constructed unit, 2401–South Hill.

Furthermore, plaintiff advances claims for investment tax credits for FYE 1978 at the following 14 remodeled restaurant units:

Kinston—Unit 1031

Lexington—Unit 1090

Graham—Unit 1201

Durham # 4—Unit 1251

Lumberton—Unit 1291

Roanoke Rapids # 2—Unit 1341

Wellons Village—Unit 1351

Rockford Street—Unit 1381

Fredericksburg—Unit 2011

Williamsburg—Unit 2271

Crater Road—Unit 2441

Galax—Unit 2521

Midlothian—Unit 2541

Horsepen—Unit 2601

Plaintiff dropped its entire claim for FYE 1978 for investment tax credits for remodeled unit, 1281–Yadkin Road.

For FYE 1979, before the court are claims for investment tax credits at the following seven newly constructed restaurant units:

Red Springs—Unit 1571

Sanford—Unit 1081

Marion—Unit 2641

Norton—Unit 2651

Radford—Unit 2661

Blackstone—Unit 2671

Vinton—Unit 2701

Plaintiff also advances claim for investment tax credits for FYE 1979 at the following remodeled restaurant units:

Fayetteville—Unit 1461

Gastonia 321 N—Unit 1551

Waynesboro—Unit 2021

South Boston—Unit 2041

West Main—Unit 2101

Danville—Unit 2121

Martinsville East—Unit 2171

Morris Blvd.—Unit 2231

Hollins Road—Unit 2291

Williamson Road—Unit 2341

Warwick Blvd.—Unit 2381

Mechanicsville—Unit 2391

Azalea—Unit 2421

Big Bethel—Unit 2481

Kinston—Unit 1031

Lincolnton—Unit 1161

Durham # 4—Unit 1251

Westgate—Unit 1261

Roanoke Rapids # 2—Unit 1341

Fredericksburg—Unit 2011

Portsmouth—Unit 2201

Plaintiff dropped its entire claim for FYE 1979 for investment tax credits for one remodeled unit, 2361–Tidewater.

The amounts claimed by plaintiff for investment tax credits in the above properties were for installations including interior marlite paneling, equipment, carousel or track window units at the drive-thru area, a mirror, reverse mansard roofs (including orange porcelain panels), and for a portion of its HVAC, electrical, plumbing, and suspended ceiling systems. The amounts claimed were derived in three ways: (1) from determinations made by the plaintiff of the percentage of eligible property within electrical, plumbing, HVAC and ceiling tile categories; (2) from studies performed by plaintiff's expert in 1990 on two newly constructed units and five remodeled units, estimating the costs incurred during the years at issue of specific assets based on available documentation; and (3) from plaintiff's extrapolation of the results of its expert's studies to the remaining unstudied units.

According to the joint stipulations, in addition to the above claims, plaintiff asserts specific investment tax credit claims for "equipment" expenditures, as follows:

FYE 78

| UNIT | ITEM | AMOUNT |
|------|------|--------|
| Mercury Blvd.—Unit 2611 | Decorative Mirror | $ 59.12 |

FYE 79

| UNIT | ITEM | AMOUNT |
|------|------|--------|
| Gastonia—Unit 1051 | Carousel Unit | $1,141.56 |
| Lexington—Unit 1090 | Carousel Unit | $1,183.68 |
| Rockford Street—Unit 1381 | Carousel Unit | $1,034.00 |
| Hwy. 301 South—Unit 1461 | Carousel Unit | $ 957.48 |
| Maple Avenue—Unit 1521 | Carousel Unit | $1,090.00 |
| Bessemer City—Unit 1531 | Carousel Unit | $1,203.24 |
| Martinsville—Unit 2030 | Carousel Unit | $1,141.00 |
| Martinsville East—Unit 2171 | Carousel Unit | $1,635.00 |
| Crater Road—Unit 2441 | Carousel Unit | $1,062.00 |
| Hickory Point—Unit 2581 | Carousel Unit | $1,047.00 |
| Mercury Blvd.—Unit 2611 | Carousel Unit | $1,042.00 |
| Fairfield—Unit 2631 | Carousel Unit | $1,041.00 |
| Lumberton # 2—Unit 1291 | Carousel Unit | $1,382.59 |
| Sanford—Unit 1081 | Decor/Light Fixtures/Signs | $4,829.00 |
| Portsmouth—Unit 2201 | Install Kitchen Equipment | $ 840.00 |

The parties have further stipulated that the plaintiff possesses invoices substantiating the costs claimed for the following units in the amounts set forth below:

| UNIT | ITEM | AMOUNT |
|------|------|--------|
| Mercury Blvd.—Unit 2611 | Mirror | $ 59.12 |
| Gastonia—Unit 1051 | Carousel Unit | $1,028.56 |
| Lexington—Unit 1090 | Carousel Unit | $1,063.68 |
| Rockford Street—Unit 1381 | Carousel Unit | $1,034.00 |
| Hwy. 301 South—Unit 1461 | Carousel Unit | $ 957.48 |
| Maple Avenue—Unit 1521 | Carousel Unit | $1,090.00 |
| Bessemer City—Unit 1531 | Carousel Unit | $1,101.24 |
| Martinsville—Unit 2030 | Carousel Unit | $1,141.00 |
| Crater Road—Unit 2441 | Carousel Unit | $1,062.00 |
| Hickory Point—Unit 2581 | Carousel Unit | $1,047.00 |
| Mercury Blvd.—Unit 2611 | Carousel Unit | $1,042.00 |
| Fairfield—Unit 2631 | Carousel Unit | $1,041.00 |
| Lumberton # 2—Unit 1291 | Carousel Unit | $ 974.00 |

However, the plaintiff does not possess an invoice to substantiate the costs in the amount of $1,635.00 claimed for the Carousel Unit at Martinsville East–Unit 2171. Plaintiff, therefore, relies on an entry in the amount of $1,635.00 in its depreciation sched-

3. The parties further stipulated that although included in the initial claim, South Hill—Unit 2401 was not placed in service in FYE 78 and, thus, was dropped from plaintiff's claim.

4. The parties agreed, however, by stipulation that due to insufficient documentation to establish whether the following remodeled unit was placed

ule for a carousel unit at the Martinsville East—Unit 2171.

The parties further stipulated that the following new units were placed in service in FYE 1978: [3]

Gastonia—Unit 1051

Tower Shopping Center—Unit 1441

Bessemer City—Unit 1531

Gastonia 321N—Unit 1551

Hillsborough—Unit 1561

Hopewell—Unit 2621

Fairfield Plaza—Unit 2631

Mercury Blvd.—Unit 2611

The following remodeled units were placed in service in FYE 1978: [4]

Lexington—Unit 1090

Galaxy—Unit 2521

Graham—Unit 1201

Durham # 4—Unit 1251

Lumberton—Unit 1291

Roanoke Rapids # 2—Unit 1341

Rockford Street—Unit 1381

Fredericksburg—Unit 2011

Crater Road—Unit 2441

Williamsburg—Unit 2271

Horsepen—Unit 2601

Wellons Village—Unit 1351

Midlothian—Unit 2541

The parties also stipulated that the following new units were placed in service in FYE 1979:

Red Springs—Unit 1571

Sanford—Unit 1081

Marion—Unit 2641

Vinton—Unit 2701

Norton—Unit 2651

Radford—Unit 2661

Blackstone—Unit 2671

The following remodeled units were placed in service in FYE 1979: [5]

Fayetteville—Unit 1461

Gastonia 321 N—Unit 1551

in service in FYE 78, the claim for remodeled unit Yadkin road—Unit 1281 was dropped.

5. The parties further specified that the available documentation is insufficient to establish that the Tidewater—Unit 2361 unit was placed in service in FYE 79. Therefore, this claim also was dropped by stipulation of the parties.

South Boston—Unit 2041

West Main—Unit 2101

Danville—Unit 2121

Martinsville East—Unit 2171

Morris Blvd.—Unit 2231

Hollins Road—Unit 2291

Williamson Road—Unit 2341

Warwick Blvd.—Unit 2381

Big Bethel—Unit 2481

Lincolnton—Unit 1161

Durham # 4—Unit 1251

Westgate—Unit 1261

Roanoke Rapids # 2—Unit 1341

Fredericksburg—Unit 2011

Portsmouth—Unit 2201

Waynesboro—Unit 2021

Azalea—Unit 2421

The five-day trial, as well as pretrial proceedings, involved numerous digressions, which are not addressed in this opinion. At times during the trial, counsel for the plaintiff and the plaintiff's witnesses struggled to present their case. Similarly, the post-trial filings by the plaintiff are disorganized and do not clearly support the plaintiff's claims. As a result, the filings offered by the plaintiff and the transcript are difficult to work with and have required the court to read, and reread, the record in order to ensure that the plaintiff has received a thorough review of the disorganized claims which were presented to the court. Moreover, the court notes that any issues raised at the trial by plaintiff's counsel as to alleged improper actions of defendant's counsel, including regarding a letter dated April 1, 1991, addressed by counsel for defendant to J.W. Turner, were resolved at a status conference held between the court and the parties on August 20, 1993. During the conference, the parties and the court concluded that no improprieties had been committed by counsel for the defendant.

## DISCUSSION

### VARIANCE

■ It has long been an established principle of federal law that "courts which are created by written law, and whose jurisdic-

tion is defined by written law, cannot transcend that jurisdiction." *Ex Parte Bollman,* 8 U.S. (4 Cranch) 75, 93, 2 L.Ed. 554 (1807) (Marshall, C.J.); *see also UNR Indus., Inc. v. United States,* 962 F.2d 1013, 1025 (Fed. Cir.1992), *aff'd sub nom., Keene Corp. v. United States,* 508 U.S. 200, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993). Thus, "[c]ourts created by statute can have no jurisdiction but such as the statute confers." *Sheldon v. Sill,* 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1849). The United States Supreme Court reiterated this cardinal principle, when it referred to: "[t]he age-old rule that a court may not in any case, even in the interest of justice, extend its jurisdiction where none exists...." *Christianson v. Colt Indus. Operating Corp.,* 486 U.S. 800, 818, 108 S.Ct. 2166, 2179, 100 L.Ed.2d 811 (1988) (citing *Sheldon v. Sill,* 49 U.S. (8 How.) 441, 449, 12 L.Ed. 1147 (1849); *see also Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 379–80, 101 S.Ct. 669, 676–77, 66 L.Ed.2d 571 (1981)) (vacating the judgment of the Court of Appeals for the Federal Circuit because of a defect in circuit court jurisdiction).

■ The jurisdiction of this federal court, like any other, is created by statute and, therefore, is subject to the jurisdictional limitations and conditions included in such statutory language. One such provision, defines in part the jurisdictional boundaries of this court. It provides in pertinent part:

§ 7422. Civil actions for refund

(a) No suit prior to filing claim for refund

No suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof.

I.R.C. § 7422(a) (1976). The regulations referenced in the above statutory provision, as promulgated by the Secretary, unequivocally

require that a claim specify in detail both a factual and legal basis sufficient to apprise the IRS Commissioner of the exact nature of the request:

§ 301.6402–2 Claims for credit or refund.

\* \* \* \* \* \*

(b) *Grounds set forth in claim.* (1) No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. The statement of the grounds and facts must be verified by a written declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

Treas.Reg. § 301.6402–2(b)(1) (1978 & 1979). Both I.R.C. § 7422 and Treas.Reg. § 301.6402–2 limit the government's waiver of sovereign immunity with respect to the tax refund jurisdiction of this court. Although formalistic, these conditions, upon which consent to suit is predicated, " 'mark the conditions of the claimant's right.' " *United States v. Felt & Tarrant Mfg.*, 283 U.S. 269, 273, 51 S.Ct. 376, 378, 75 L.Ed. 1025 (1931) (quoting *Rock Island, A. & L. R.R. v. United States*, 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188 (1920)); *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1137 (Fed.Cir.1983). Thus, to the extent the taxpayer fails to meet the conditions specified in either I.R.C. § 7422 or Treasury Reg. § 301.6402–2, the United States, as sovereign, remains immune from suit. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941) (citing *United States v. Thompson*, 98 U.S. 486, 25 L.Ed. 194 (1878); *United States v. Lee*, 106 U.S. 196, 1 S.Ct. 240, 27 L.Ed. 171 (1882); *Kansas v. United States*, 204 U.S. 331, 27 S.Ct. 388, 51 L.Ed. 510 (1907); *Minnesota v. United States*, 305 U.S. 382, 59 S.Ct. 292, 83 L.Ed. 235 (1939); *Keifer & Keifer v. Reconstruction Finance Corp.*, 306 U.S. 381, 59 S.Ct. 516, 83 L.Ed. 784 (1939); *United States v. Shaw*, 309 U.S. 495, 60 S.Ct. 659, 84 L.Ed. 888 (1940)). Indeed, "[t]he filing of a claim or demand as a prerequisite to a suit to recover taxes paid is a familiar provision of the revenue laws, compliance with which may be insisted upon by the defendant, whether the collector or the United States." *Felt & Tarrant*, 283 U.S. at 272, 51 S.Ct. at 377 (citing *Tucker v. Alexander*, 275 U.S. 228, 48 S.Ct. 45, 72 L.Ed. 253 (1927); *Maryland Casualty Co. v. United States*, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1920); *Kings County Savings Institution v. Blair*, 116 U.S. 200, 6 S.Ct. 353, 29 L.Ed. 657 (1886); *Nichols v. United States*, 74 U.S. (7 Wall.) 122, 19 L.Ed. 125 (1868)).

■ The statute and the regulation, which require that a claim for refund set forth in detail each ground upon which a credit or a refund is based, including sufficient facts to apprise the IRS Commissioner of the exact basis of the claim, "preclude a taxpayer-plaintiff from substantially varying at trial the factual bases of its arguments from those raised in the refund claims it presented to the IRS." *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138 (Fed.Cir. 1983); *Union Carbide Corp. v. United States*, 222 Ct.Cl. 75, 90, 612 F.2d 558, 566 (1979); *Cook v. United States*, 220 Ct.Cl. 76, 86–87, 599 F.2d 400, 406 (1979); *Southwestern Life Ins. Co. v. United States*, 560 F.2d 627, 631 (5th Cir.1977), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1647, 56 L.Ed.2d 84 (1978); *Union Pacific R.R. v. United States*, 182 Ct.Cl. 103, 108–09, 389 F.2d 437, 442 (1968); *Davis v. United States*, 21 Cl.Ct. 84, 86 (1990); *Brookes v. United States*, 20 Cl.Ct. 733, 738 (1990); *North Carolina Citizens for Business & Indus. v. United States*, 18 Cl.Ct. 106, 117 (1989). The rule prohibiting variance between a claim for refund and subsequent claims raised in litigation is designed both " 'to prevent surprise and to give adequate notice to the [Internal Revenue] Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination.' " *Ottawa Silica Co.*, 699 F.2d at 1138 (quoting *Union Pacific R.R. v. United States*, 182 Ct.Cl. at 109, 389 F.2d at 442 (1968)); *Southwestern Life Ins. Co. v. United*

*States,* 560 F.2d 627, 631 (5th Cir.1977); *see also Davis v. United States,* 21 Cl.Ct. at 86; *Brookes v. United States,* 20 Cl.Ct. at 738; *North Carolina Citizens for Business & Indus. v. United States,* 18 Cl.Ct. at 117. Furthermore, the mere availability of the facts to set forth a claim is not sufficient. The Service need not anticipate or deduce the taxpayer's arguments, for the plaintiff bears the burden of notifying the IRS of its intentions with respect to such facts. *Commercial Solvents Corp. v. United States,* 192 Ct.Cl. 339, 349–50, 427 F.2d 749, 755, *cert. denied,* 400 U.S. 943, 91 S.Ct. 242, 27 L.Ed.2d 247 (1970); *Brookes v. United States,* 20 Cl.Ct. at 738.

■ If, however, a claim for refund states only general grounds for relief, an item raised in litigation but not specifically adverted to in the refund claim might be considered sufficient, but only "if it is found that the taxpayer adequately alerted the Service to the fact that the item is a ground for refund, or that the Commissioner considered that unspecified ground in reaching his decision on the items for which a refund was requested." *Union Pacific R.R. v. United States,* 182 Ct.Cl. at 109, 389 F.2d at 442; *Davis v. United States,* 21 Cl.Ct. at 86; *North Carolina Citizens for Business & Indus. v. United States,* 18 Cl.Ct. at 117–18. Moreover, any communications by which the IRS might be provided "actual notice" of a refund claim, *Davis,* 21 Cl.Ct. at 86, must be in writing, for undocumented statements are insufficient, *Furst v. United States,* 230 Ct. Cl. 375, 380–81, 678 F.2d 147, 151–52 (1982); *Disabled American Veterans v. United States,* 227 Ct.Cl. 474, 476–77, 650 F.2d 1178, 1179–80 (1981); *Pinckes v. United States,* 7 Cl.Ct. 570, 571 (1985). The rationale for the requirement that a claim must be clearly articulated in writing was stated by the court in *Wrightsman Petroleum Co. v. United States,* 92 Ct.Cl. 217, 35 F.Supp. 86 (1940), *cert. denied,* 313 U.S. 578, 61 S.Ct. 1095, 85 L.Ed. 1535 (1941), as follows:

> There is a good reason for the requirement that the claim be in writing. It is common knowledge that the personnel in governmental departments is constantly changing. Many times several different employees work on a single case. Some of

them have before them only such information as is contained in the files. For this reason, and because of the shortness of the memory of man, and for many other reasons, only a written claim is sufficient to meet the requirements of the statute and the need it intended to fill. *Ritter v. United States,* 28 F.2d 265 (3rd Cir.1928).

*Id.* at 238.

■ Prior to trial in the above-captioned case, and in its post-trial briefing, defendant moved to dismiss the following claims:

*Finishes*
 Marlite—Interior Paneling

*HVAC*
 Toilet Exhaust
 Kitchen Exhaust—Install Fans

*Electrical*
 Vehicular Detector System
 Parking Lot Lighting
 Signs—Interior and Exterior
 Decorative Lighting—Interior
 Decorative Lighting—Exterior
 Exit Lights
 Security Lights
 Emergency Lights

*Plumbing*
 Hot Water Heater

*Finishes—Marlite Interior Paneling*

Defendant moved to dismiss plaintiff's claims for refund to the extent such claims were predicated on plaintiff's assertion that its claim for "Marlite—Interior Paneling" are eligible for the investment tax credit. The record before this court reflects that the plaintiff asserted no claim for Marlite—Interior Paneling either in its 1978, or 1979, 1120X Amended U.S. Corporation Income Tax Returns or in the eighteen-page document attached to both. Indeed, there is no mention of Marlite—Interior Paneling in plaintiff's 1978, or 1979, claims for refund. Furthermore, the trial transcript reflects no communications by which the plaintiff provided the IRS with actual or written notice sufficient to properly incorporate "Marlite—Interior Paneling" in its refund claim. Plaintiff's claim for refund for Marlite—Interior

Paneling for 1978 and 1979, as filed in this court, therefore, is dismissed.

### HVAC—Toilet Exhaust

Defendant requested dismissal of this claim in its post-trial brief. In its post-trial brief, however, plaintiff noted that this claim was already conceded as barred by the doctrine of variance by plaintiff at trial. This claim, therefore, is dismissed by agreement of the parties.

### HVAC—Kitchen Exhaust–Install Fans

Defendant moved to dismiss plaintiff's claims for refund to the extent such claims were based on plaintiff's claim that the item entitled "Kitchen Exhaust—Install Fans" is eligible for the investment tax credit. The record before this court reflects that plaintiff asserted no claim for "Kitchen Exhaust—Install Fans" either in its 1978, or 1979, 1120X Amended U.S. Corporation Income Tax Returns or in the eighteen-page document attached to both. Indeed, there is no mention of "Kitchen Exhaust—Install Fans" in plaintiff's 1978 or 1979 claims for refund. Furthermore, although counsel for the plaintiff stated that kitchen exhaust should be

considered as a component of the HVAC claim,[6] the trial transcript reflects no communications by which the plaintiff provided the IRS with the requisite actual or written notice sufficient to properly incorporate "Kitchen Exhaust—Install Fans" in its refund claim. Plaintiff's claim for refund for this item for 1978 and 1979, as filed in this court, therefore, is dismissed.

### Electrical—Vehicular Detector System

Defendant moved to dismiss plaintiff's claims for refund to the extent such claims were based on plaintiff's claim that the item entitled "Vehicular Detector System" is eligible for the investment tax credit. The record before this court reflects that plaintiff asserted no claim for the electrical wiring and installation of a vehicular detection system either in its 1978, or 1979, 1120OX Amended U.S. Corporation Income Tax Returns, or in the eighteen-page document attached to both. Indeed, there is no mention of such a system in plaintiff's 1978 or 1979 claims for refund filed with the IRS. Furthermore, although this item was presented at trial,[7] the trial transcript and attached

---

**6.** In her closing argument, one of plaintiff's counsel stated:

[MS. POWER]
As to the kitchen exhaust system, Defendant's own witness has testified that Plaintiff's heating ventilating and air conditioning systems contain exhaust as a part thereof.

Again, we believe it is clearly encompassed within the broad language of that section of the claim for a refund.
The court notes, however, that any concession by defendant during trial, either explicit or implied, does not relieve this court from addressing the variance issue. To the extent this question gives rise to a jurisdictional defect, this court must dismiss the claim regardless of any waiver by defendant.

**7.** One of plaintiff's counsels in his opening argument referred to the original tax return filed with the IRS and stated:

[MR. POWER]
That tax return was audited by IRS, and the portion of the ITC credit claims were held to be components of restaurant buildings by the IRS engineer, who will be a witness in this case on behalf of the Defendant.

That entire claim was rejected by the engineer at [sic] the original tax return, notwithstanding the fact the engineer found that certain assets were eligible for the credit, such as the drive-through windows, the french fry fans, the griddle fan, the exhaust fan, a hole in the

roof for certain exhaust equipment, and wiring to vehicle detector systems, and to the speaker system for the drive-through window, and the water line to the hood, and I don't know, several others he held would qualify for the credit.
On direct examination of George T. Hamilton, vehicular detector systems were addressed as follows:

[MR. HAMILTON]
Going back to the question and the blueprints, we have Asset 5322, 1141, and 1140 marked on the drawing.

What we find here going down on this specific page, we find Asset 1140 is the vehicular detector system which is the order station.

So that when a vehicle drives up, it sounds a little bell inside of the restaurant so that somebody can take an order.

Included within those costs, is to install only the drive up order station with pneumatic line, a three quarter inch conduit drive up, and a 20 amp single pull circuit breaker.

So what we have there, is that we have a cost for installing the pneumatic line, which is a detection system by the pad, that car drives over and sets the bell off on. We have a three quarter inch conduit, which is the conduit size that goes from the order station into the structure.

And you have a 20 amp single pull circuit breaker. That 20 amp single pull circuit

exhibits reflect no communications by which the plaintiff provided the IRS with the requisite actual or written notice sufficient to properly incorporate wiring and installation of a vehicular detector system in its refund claim. Plaintiff's claim for refund for this item for 1978 and 1979, as filed in this court, therefore, is dismissed.

*Electrical—Parking Lot Lighting*

Defendant requested dismissal of this claim in its post-trial brief. In its post-trial brief, plaintiff notes that the claim for "Parking Lot Lighting" was already conceded by plaintiff at trial. It, therefore, is dismissed by agreement of the parties.

*Electrical—Interior and Exterior Signs*

In its post-trial brief, defendant moved to dismiss plaintiff's claims for refund to the extent such claims were based on plaintiff's claim that the item entitled "Signs—Interior and Exterior" was eligible for the investment tax credit. The record before this court, however, reflects that defendant withdrew its objection to this claim upon clarification that it was the intention of plaintiff to claim, not signs, but rather the wiring to signs. Indeed, government counsel stated in his closing argument:

[MR. FRAHM]

Similarly, when Mr. Jones testified on re-direct that it was his intention to claim, not signs, but the wiring to signs, and that his claim for refund only made claim for wiring to items, we find that similarly convincing and we are willing to concede our claim as to variance on wiring to signs, as opposed to the signs themselves. As far as we are aware at this point, they are not claiming signs themselves. Once variance is disposed of, the Court may go on to consider liability and damages.

This claim, therefore, remained for adjudication by the court.

*Electrical—Decorative Lighting—Interior*

■ Defendant moved to dismiss plaintiff's claims for refund to the extent such claims were based on plaintiff's claim that the item entitled "Decorative Lighting—Interior" is eligible for the investment tax credit. The record before the court reflects, however, that plaintiff in its memoranda, attached to both the 1978, and 1979, 1120X Amended U.S. Corporation Income Tax Returns, references "decorative lights," one of the devices for which wiring and installation was the subject of a claim for refund. This was corroborated by the testimony of plaintiff's witness, William Robert Jones, on direct examination:

[MR. POWER]

Q Can you explain whether the decorative lighting was included in the claim or not?

[MR. JONES]

A The decorative lighting, meaning chandeliers, was included in the claim.

Q What about decorative lighting or lighting exterior to the building?

A I'd say that would be included in the claim.

As discussed above, the rule prohibiting variance is designed both "to prevent surprise and to give adequate notice to the [Internal Revenue] Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination." *Ottawa Silica Co.,* 699 F.2d at 1138 (quoting *Union Pacific R.R. v. United States,* 182 Ct.Cl. at 109, 389 F.2d at 442 (1968)); *Southwestern Life Ins. Co. v. United States,* 560 F.2d 627, 631 (5th Cir.1977); *see also Davis,* 21 Cl.Ct. at 86; *Brookes,* 20 Cl.Ct. at 738; *North Carolina Citizens for Business & Indus.,* 18 Cl.Ct. at 117. The court concludes that such notice was provided to the IRS for this claim. The claim for "decorative lighting," as specified at page three of the memoranda attached to both claims for refund, provided the IRS with actual written notice of plaintiff's refund claim. Accordingly, this claim remained for adjudication by the court.

---

breaker is shown further back in one of the electrical drawings. It provides the power specifically to the order station.

Although both the argument of plaintiff's counsel and the testimony of Mr. Hamilton address the design and operation of the system, they fail to indicate with any specificity how the vehicular detector system was part of plaintiff's monetary claim for refund filed with the IRS.

*Electrical Decorative Lighting—Exterior*

Defendant moved to dismiss plaintiff's claims for refund to the extent that such claims were based on plaintiff's claim that the item entitled "Decorative Lighting—Exterior" is eligible for the investment tax credit. The record before the court reflects, however, that plaintiff in its memoranda attached to its 1978, and 1979, 1120X Amended U.S. Corporation Income Tax Returns, references "decorative lights," one of the devices for which wiring and installation was the subject of a claim for refund. Further corroboration occurred during the testimony of plaintiff's witness, William Robert Jones, on direct examination:

[MR. POWER]

Q Can you explain whether the decorative lighting was included in the claim or not?

[MR. JONES]

A The decorative lighting, meaning chandeliers, was included in the claim.

Q What about decorative lighting or lighting exterior to the building?

A I'd say that would be included in the claim.

As discussed above, the rule prohibiting variance is designed both "to prevent surprise and to give adequate notice to the [Internal Revenue] Service of the nature of the claim and the specific facts upon which it is predicated, thereby permitting an administrative investigation and determination." *Ottawa Silica Co.*, 699 F.2d at 1138 (quoting *Union Pacific R.R. v. United States*, 182 Ct.Cl. at 109, 389 F.2d at 442 (1968)); *Southwestern Life Ins. Co.*, 560 F.2d at 631; *see also Davis*, 21 Cl.Ct. at 86; *Brookes*, 20 Cl.Ct. at 738; *North Carolina Citizens for Business & Indus.*, 18 Cl.Ct. at 117. The court concludes that such notice was provided to the IRS for this claim. Furthermore, this claim for "decorative lighting" as specified at page three of the memoranda attached to both claims for refund provided the IRS with actual written notice of plaintiff's refund claim. This claim, therefore, remained for adjudication by this court.

*Electrical—Exit Lights*

Defendant requested dismissal of this claim in its post-trial brief. Plaintiff, in its post-trial brief, notes that the claim for "Exit Lights/Signs" was already conceded by plaintiff at trial. It, therefore, is dismissed by agreement of the parties.

*Electrical—Security Lights*

Defendant requested dismissal of this claim in its post-trial brief. Plaintiff, in its post-trial brief, notes that the claim for "Security Lights" was already conceded by plaintiff at trial. It, therefore, is dismissed by agreement of the parties.

*Electrical—Emergency Lights*

Defendant moved to dismiss plaintiff's claims for refund based on plaintiff's claim that the item entitled "Emergency Lights" is eligible for the investment tax credit. The record before this court reflects that plaintiff asserted no claim for the electrical wiring and installation of emergency lights or for wiring for such a purpose either in its 1978, or 1979, 1120X Amended U.S. Corporation Income Tax Returns, or in the eighteen-page document attached to both. Further, there is no mention of such a system in plaintiff's 1978 or 1979 claims for refund. Moreover, the trial transcript reflects uncertainty by the plaintiff as to whether such a claim was made in the refund claims or not. Indeed, counsel for the plaintiff, Mr. Powers, conceded that emergency lights were not included in the original claim:

[MR. POWER]

We have after, with some diligence, discovered that in addition to the parking lot lights that we admitted was not in the original claim, have found that the wiring to exit lights and emergency lights was also not included in the original claim, and that will be, hopefully, two more items removed from the list of variance issues that we will solve in our procedure.

Although William Robert Jones, on direct examination, stated that emergency lights would have been included in the refund claim, he also referenced "battery backed emergency lights" and stated that they would have been included as part of the "equipment package":

[MR. POWER]

Q How about emergency lights?

[MR. JONES]

A Emergency lights would have been included. The battery backed emergency lights would have been included as part of our equipment package.

Testimony elicited from Mr. Jones by defendant's counsel, upon cross-examination revealed that the battery operated emergency packs had already been allowed as a credit by the IRS and were not included in the refund claim:

[MR. FRAHM]

Q Okay, thank you. Now in this same description of electrical, there is no indication of any claim for emergency lighting fixtures as opposed to wiring for those fixtures. Correct?

[MR. JONES]

A The emergency lighting fixtures? The battery operated types?

Q Well, you tell me. You are now claiming battery operated packs.

A Correct. We claim the battery operated emergency packs as part of the equipment package.

Q You're claiming that in this litigation now?

A No, no. It's part of the equipment package.

Q So it was all ready allowed?

A That's right.

Q So again any indication in Mr. Hamilton's study that it's being claimed now is erroneous because it's all [sic] ready been allowed. Correct?

A It would have been allowed, yes.

Also, to add to the confusion, Mr. Jones testified to the existence of two types of emergency lights. Relying upon a review of plaintiff's Exhibit 1019 at page E1 (Gastonia blueprint), Mr. Jones testified to another category of emergency lighting referenced on the blueprint as item J: "chloride emergency light":

[MS. POWER]

Q I believe you testified yesterday that the emergency lights would be included in the equipment package?

[MR. JONES]

A That's correct.

Q I'd like to refer you to Exhibit 1019, page E–1. For Gastonia unit, 1019.

A I have it.

Q Okay, specifically to the fixture schedule, can you tell me what it says on the second line there with respect to item 'B' as in 'Boy'?

A Item B on the fixture schedule says supplied by owner.

Q And what does that mean?

A That means as a normal part of our equipment package we would supply these lights.

Q And they would be included in the equipment package cost?

A In the equipment package cost. That's correct.

Q Okay, I would like also to refer you to item J. Have you found it?

\* \* \* \* \* \*

Q Can you read it where it says with respect to item J?

A Item J is a chloride emergency light required by code supplied with fixture. Based on this it would be supplied by the contractor.

Q What would?

A The emergency light.

Q So that it would not be in your equipment package?

A It would not be in our equipment package.

Furthermore, counsel for the plaintiff, Ms. Power, in a somewhat singular dialogue with the court, conceded that emergency lights among other items claimed were not encompassed within the broad language of the memorandum attached to plaintiff's 1978 and 1979 refund claims:

[MS. POWER]

With respect to the remaining four variance items, however, the interior and exterior and emergency lights and the marlite, the issue still remains.

The description is not encompassed within that broad language.

THE COURT: I'm not sure I understand what you're saying. What description is not encompassed?

MS. POWER: The description of interior, exterior, and emergency lights.

THE COURT: Is not encompassed in what broad language?

MS. POWER: In the broad language attached to the claim for a refund.

THE COURT: So it's excluded.

MS. POWER: No, Your Honor.

THE COURT: What are you saying?

MS. POWER: It's not within that description attached to the refund.

THE COURT: I still don't understand.

MS. POWER: The eighteen page narrative description does not specifically mention those items.

THE COURT: Okay. Well, how do you then get it into the complaint?

MS. POWER: It's within the dollar amounts claimed.

THE COURT: Okay. It's not in the description, but you're saying it is still within the claim because it's in the dollar amounts.

MS. POWER: Yes.

THE COURT: Okay. Go ahead.

MS. POWER: This is the area that is the cause for the greatest concern we believe.

This is the situation where the U.S. government is going to exercise its sovereign immunity to deny a citizen its claim.

Mr. Frahm will tell you that this issue is so serious that he has to seek special approval to pursue it.

The purpose of the law in this area—

THE COURT: To pursue it in what context? I mean he can defend the lawsuit clearly. What are you saying?

MS. POWER: To pursue a variance claim.

THE COURT: To pursue paying for a variance claim or are you saying—I mean he can obviously defend the lawsuit. There's no question about that.

MS. POWER: It's my understanding that Mr. Frahm has to seek special permission to bring up the issue of variance.

THE COURT: Mr. Frahm, do you want to comment? I'm lost.

MR. FRAHM: Your Honor, in I suppose the last few years or so the assistant attorney general's office has expressed a greater interest in the government's raising various jurisdictional matters.

As a formal matter before various jurisdictional defenses are raised—

THE COURT: Got you.

MR. FRAHM: I send out a memo saying it's Okay.

THE COURT: Right.

MR. FRAHM: to do this.

THE COURT: In other words it's simply a question of raising a defense.

MR. FRAHM: Exactly. Exactly.

THE COURT: Okay. All right. That's a very different matter. Okay. I understand that. Go ahead.

MS. POWER: The purpose of the law is to make certain that I.R.S. has an opportunity to correct its mistakes by being afforded an opportunity of notice before suing them in court.

Mr. Frahm's argument is clear as developed in the numerous pleadings on this case.

He would deny the taxpayer a claim, not withstanding the fact that the claim was reviewed on audit, denied in full on audit, everything was disputed on protest, and the same dollar amounts were included in the claim for a refund.

These dollar figures are contained in joint exhibit four, page eight, eleven, twelve, and thirteen.

As shown on the work papers of Denis Nonaka the total amount disallowed for the 1978 year is $708,464.12.

The total amount disallowed for the 1979 year is $755,245.40.

This is the exact same amount that was included in the protest.

This is the exact same amount minus the claim for the quarry tile and the drive-

through concrete that was included in the claim for a refund.

Mr. Frahm has solicited from Mr. Jones that Mr. Nonaka's report did not quantify the specific amount for the H.V.A.C., the electric, etc. amounts. A review of that report will show that this is because the disallowance as calculated by Mr. Nonaka is on a unit by unit basis.

Those assets are contained within each of the calculations for the sixty units.

In order to get to the same totals, you would have to add those up from Mr. Nonaka's report.

Mr. Frahm is going to deny the taxpayer's claim because of inartfully drawn language on the narrative description in the claim for a refund.

THE COURT: Okay. The narrative description is an exhibit to what? Which one do you mean?

MS. POWER: The amended tax return.

THE COURT: Okay. It's the narrative description to the amended tax return you're talking about consistently.

MS. POWER: Yes.

THE COURT: Is that right?

MS. POWER: Yes. This is Mr. Frahm's sole evidence on this issue.

This is not an issue of whether the taxpayer has dropped anything. The dollars are exactly the same.

This is a matter of whether the failure to include the description of an asset in the language precludes the taxpayers claim for a refund.

In other words, if you forgot to mention in an eighteen page description that you were also claiming the lightbulbs they would be denied.

Notwithstanding discussion of emergency lighting at trial, and extensive opportunities throughout the trial afforded to plaintiff's counsel to present plaintiff's best evidence, the record and trial transcript reflect no communications by which the plaintiff provided the IRS with the requisite actual or written notice sufficient to properly incorporate emergency lighting, including "chloride emergency lights" specified as item J in exhibit 1019, other than battery-backed emergency lighting, which was already allowed as a credit by the IRS in plaintiff's refund claim. Plaintiff's claim for refund for this item for 1978 and 1979, as filed in this court, therefore, is dismissed.

*Plumbing—Hot Water Heater*

Defendant in its post-trial brief stated that "[a]t the conclusion of trial, defendant conceded that variance did not apply to plaintiff's claims for hot water heaters, finding plaintiff's testimony on the matter convincing." The transcript bears this out:

[MR. FRAHM]

Now, as to other variance items, frankly, the government finds Mr. Jones' testimony convincing. He testified that it was his intention to claim the hot water heater in the restaurant as part of the plumbing system and that the plumbing system was, indeed, included in the claim for refund. And we find that persuasive and for that reason, I am willing to withdraw our claim as to variances to the hot water heater.

This claim, therefore, remained for adjudication by this court.

*Miscellaneous Items of Equipment for FYE 1979*

Finally, this court rules on two investment tax credit claims for alleged equipment expenditures for FYE 1979, in particular: "Decor/Light Fixtures/Signs" for Sanford—Unit 1081 in the amount of $4,829.00, and "Install Kitchen Equipment" for Portsmouth—Unit 2201 in the amount of $840.00. A scrutinizing review by this court of the 1979 amended tax return and attached documents, specifically under the category of equipment, reveals only a description of drive-thru or carousel windows. No mention is made of kitchen equipment of any kind or of any decor, light fixture or sign item for FYE 1979. Furthermore, the trial transcript reflects no communications by which plaintiff provided the IRS with actual or written notice sufficient to properly incorporate these items of equipment in its refund claim for FYE 1979.

*LIABILITY* .

In a tax refund case, there is a strong presumption of the correctness of the findings of the Commissioner of Internal Revenue. *Lima Surgical Assocs., Inc. v. United States,* 944 F.2d 885, 888 (Fed.Cir. 1991). The taxpayer not only has the burden of rebutting that presumption, but also of establishing entitlement to the specific amount of the deduction claimed. *United States v. Janis,* 428 U.S. 433, 440–441, 96 S.Ct. 3021, 3025–26, 49 L.Ed.2d 1046 (1976); *Helvering v. Taylor,* 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623 (1935); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Danville Plywood Corp. v. United States,* 899 F.2d 3, 7–8 (Fed.Cir. 1990); *Barenholtz v. United States,* 784 F.2d 375, 381 (Fed.Cir.1986); *Young & Rubicam, Inc. v. United States,* 187 Ct.Cl. 635, 654–55, 410 F.2d 1233, 1244–45 (1969); *L.W. Hardy Co. v. United States,* 1 Cl.Ct. 465, 470 (1982). In order to overcome the presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States,* 206 Ct.Cl. 143, 151–152, 510 F.2d 1365, 1369 (1975); *Arrington v. United States,* 34 Fed.Cl. 144, 147 (1995). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. A plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *Transamerica Corp. v. United States,* 902 F.2d 1540, 1543 (Fed.Cir.1990); *Danville Plywood Corp. v. United States,* 899 F.2d at 7–8; *Arrington v. United States,* 34 Fed.Cl. at 147. Even after satisfying the burden of going forward, a plaintiff must still carry the ultimate burden of proof. *Transamerica Corp. v. United States,* 902 F.2d at 1543; *Danville Plywood Corp. v. United States,* 899 F.2d at 8.

In the above captioned case, plaintiff has cited sections of the Internal Revenue Code of 1954, as amended and in effect during FYE 1978 and 1979, which it argues provided a tax credit for investments for certain types of property. The pertinent provisions of I.R.C. § 48 define section 38 property [8] as follows:

**§ 48. Definitions; special rules**

**(a) Section 38 property**

**(1) In general**

Except as provided in this subsection, the term "section 38 property" means—

(A) tangible personal property (other than an air conditioning or heating unit), or

(B) other tangible property (not including a building and its structural components) but only if such property—

(i) is used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

\*　　\*　　\*　　\*　　\*　　\*

(iii) constitutes a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), or....

I.R.C. § 48(a)(1) (1976 & Supp. II 1978). Treasury Regulation § 1.48–1(c) and 1.48–1(d) defines tangible personal property and other tangible property, as follows:

(c) *Definition of tangible personal property. If property is tangible personal property it may qualify as section 38 property irrespective of whether it is used as an integral part of an activity (or constitutes a research or storage facility used in connection with such activity) specified in paragraph (a) of this section. Local law shall not be controlling for purposes of determining whether property is or is not*

---

8. I.R.C. § 38 states:
 **§ 38. Investment in certain depreciable property.**
 **(a) General rule**
 There shall be allowed, as a credit against the tax imposed by this chapter, the amount determined under subpart B of this part.

 **(b) Regulations**
 The Secretary shall prescribe such regulations as may be necessary to carry out the purposes of this section and subpart B.
 I.R.C. § 38 (1976).

"tangible" or "personal".... Thus, the fact that under local law property is held to be personal property or tangible property shall not be controlling. Conversely, property may be personal property for purposes of the investment credit even though under local law the property is considered to be a fixture and therefore real property. *For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures).* Thus, buildings, swimming pools, paved parking areas, wharves and docks, bridges, and fences are not tangible personal property. *Tangible personal property includes all property (other than structural components) which is contained in or attached to a building.* Thus, such property as production machinery, printing presses, transportation and office equipment, refrigerators, grocery counters, testing equipment, display racks and shelves, and neon and other signs, which is contained in or attached to a building constitutes tangible personal property for purposes of the credit allowed by section 38. Further, all property which is in the nature of machinery (*other than structural components of a building or other inherently permanent structure*) shall be considered tangible personal property even though located outside a building. Thus, for example, a gasoline pump, hydraulic car lift, or automatic vending machine, although annexed to the ground, shall be considered tangible personal property.

(d) *Other tangible property*—(1) *In general.* In addition to tangible personal property, any other tangible property (*but not including a building and its structural components*) used as an integral part of manufacturing, production, or extraction, or as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or which constitutes a research or storage facility used in connection with any of the forego-

ing activities, may qualify as section 38 property.

Treas.Reg. § 1.48–1(c) (1978 & 1979) (emphasis added). Both I.R.C. § 48 and the definitions of tangible personal property included in Treas.Reg. § 1.48–1(c), and other tangible property included in Treas.Reg. § 1.48–1(d), explicitly exclude building and structural components from the definition of credit eligible section 38 property. The Treasury Regulation also sets forth an exhaustive and broad definition of "building and structural components":

(e) *Definition of building and structural components.* (1) *Buildings and structural components thereof do not qualify as section 38 property.* The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide working, office, parking, display, or sales space. The term includes, for example, structures such as apartment houses, factory and office buildings, warehouses, barns, garages, railway or bus stations, and stores. Such term includes any such structure constructed by, or for, a lessee even if such structure must be removed, or ownership of such structure reverts to the lessor, at the termination of the lease. Such term does not include (i) a structure which is essentially an item of machinery or equipment, or (ii) a structure which houses property used as an integral part of an activity specified in section 48(a)(1)(B)(i) if the use of the structure is so closely related to the use of such property that the structure clearly can be expected to be replaced when the property it initially houses is replaced. Factors which indicate that a structure is closely related to the use of the property it houses include the fact that the structure is specifically designed to provide for the stress and other demands of such property and the fact that the structure could not be economically used for other purposes. Thus, the term "building" does not include such structures as oil and gas storage tanks, grain storage bins, silos, fractionating towers, blast furnaces, basic oxygen

furnaces, coke ovens, brick kilns, and coal tipples.

(2) *The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefore such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; plumbing and plumbing fixtures, such as sinks and bathtubs; electric wiring and lighting fixtures; chimneys; stairs, escalators, and elevators, including all components thereof; sprinkler systems; fire escapes; and other components relating to the operation or maintenance of a building. However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs.* Machinery may meet the "sole justification" test provided by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components".

Treas.Reg. § 1.48–1(e) (1978 & 1979) (emphasis added).

 Based on a reading of the clear language of the above statutory and regulatory scheme, to the extent any of the claimed items are expressly listed as a building or structural component in the regulations, they should be excluded from the definition of section 38 property and are not creditable. Only those deductions specifically provided for in the statute or regulations should be entitled to credit. As stated by the Supreme Court of the United States:

> The propriety of a deduction does not turn upon general equitable considerations, such as a demonstration of effective economic and practical equivalence. Rather, it "depends upon legislative grace; and only as there is clear provision therefor can any particular deduction be allowed." *New Colonial Ice Co. v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 788, 790, 78 L.Ed. 1348 (1934); *Deputy v. du Pont,* 308 U.S. 488, 493, 60 S.Ct. 363, 366, 84 L.Ed. 416 (1940).

*Commissioner v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148–49, 94 S.Ct. 2129, 2137, 40 L.Ed.2d 717 (1974).

Plaintiff, however, asserts that this court should adopt the reasoning of the United States Tax Court in *Scott Paper Co. v. Commissioner,* 74 T.C. 137, 1980 WL 4586 (1980), as a basis for allowing the tax credits for several of the items plaintiff claims. For example, although plaintiff acknowledged in its post trial brief that *Metro National Corporation v. Commissioner,* 52 T.C.M. (CCH) 1440, 1987 WL 40120 (1987), and *Texas Instruments Inc. v. Commissioner,* 63 T.C.M. (CCH) 3070, 1992 WL 110779 (1992), support the denial of an investment tax credit for ceiling tiles, plaintiff attempted to distinguish these cases from the instant case. While primarily relying on the United States Tax Court holding in *Scott Paper Co. v. Commissioner,* 74 T.C. 137, 1980 WL 4586 (1980), plaintiff also discussed *Consolidated Freightways, Inc. v. United States,* 223 Ct.Cl. 443, 620 F.2d 862 (1980). Plaintiff stated the following in its brief:

> Again, a *Scott Paper* analysis supports Plaintiff's claim for the suspended ceiling system consisting of the readily cleanable tiles located in the kitchen food processing and servicing areas. The focus of such an analysis is on the ultimate use of the asset and an asset which does not relate to the operation and maintenance of the building should not be considered a structural component despite being listed as an example of such in the Regulations. *Scott Paper,* supra. In conducting such analysis one needs to consider for those assets which

may appear to serve dual purposes-relating to the business or equipment and relating to the operation of the building-whether any "building" function is merely incidental to the principal function for which the asset was installed *Consolidated Freightways,* supra. Regulations section 1.48–1(e)(2) itself calls for such an inquiry.

In *Scott Paper,* the Tax Court ruled that it was improper to read the definition of "structural components," in Treasury Regulation § 1.48–1(e)(2), "in a vacuum." *Id.* at 182–83. Rather, in those cases the Tax Court ruled that "[i]tems which occur in an unusual circumstance and do not relate to the operation or maintenance of a building should not be structural components, despite being listed in section 1.48–1(e)(2), Income Tax Regs." *Id.* at 183. In support of a general expansion of the investment tax credit, even to items specifically listed in the definition of "structural components" by the Treasury Regulation, the *Scott Paper* court pointed to the last sentence of Treasury Regulation § 1.48–1(e)(2), which follows the list of items expressly considered to be structural components, and states: "and other components relating to the operation or maintenance of a building." *Scott Paper Co. v. Commissioner,* 74 T.C. at 182–83. The *Scott Paper* court wrote: "Accordingly, the critical test for all primary electric improvements is whether they relate to the overall operation and maintenance of a building." The *Scott Paper* court concluded that the "sole justification" exception included in the Treasury Regulation definition of "structural components," which explicitly allows a tax credit for the installation of air conditioning or heating systems necessary to meet temperature or humidity requirements essential for the operation of other machinery or the processing of materials or foodstuffs, supports adopting an operation and maintenance relationship test.

In *Illinois Cereal Mills, Inc. v. Commissioner,* 789 F.2d 1234 (7th Cir.1986), the Seventh Circuit adopted the "function" test established in *Scott Paper* and held that the test for a structural component should be whether the item relates " 'to the operation and maintenance of a building.' " *Illinois Cereal Mills, Inc.,* 789 F.2d at 1244 (citing

Treas.Reg. § 1.48–1(e)(2)). The Fourth Circuit in *A.C. Monk & Co. v. United States,* however, adopted a different approach and set out another standard, "whether ... [the item] can be reasonably adapted in the present building to more general uses," and concluded, "[i]f so, they are structural components of the building." *Id.* at 1066. The item, however, "need not be adaptable to all conceivable uses, but only flexible enough that it is not inextricably linked to the present, specific machinery." *Id.* at 1066.

Subsequently, in *Commissioner v. Illinois Cereal Mills,* 479 U.S. 995, 107 S.Ct. 600, 93 L.Ed.2d 600 (1986), the Supreme Court denied certiorari. In a published dissent, Justice White stated that because there was a conflict on the issue of 28 U.S.C. § 38 credits between the United States Court of Appeals for the Seventh Circuit, in *Commissioner v. Illinois Cereal Mills,* and the United States Court of Appeals for the Fourth Circuit, in *A.C. Monk & Co. v. United States,* 686 F.2d 1058 (4th Cir.1982), certiorari should be granted. In commenting on the conflicting decisions, Justice White stated:

> The Fourth Circuit in *A.C. Monk & Co. v. United States,* 686 F.2d 1058, 1065–1066 ( [4th Cir.] 1982), rejected the allocation method adopted by the Tax court in *Scott Paper* and held that an electrical system can qualify for the credit only if it is so "inextricably linked to the present, specific machinery" that it cannot "be reasonably adapted in the present building to more general uses." If a manufacturer converting the building to another use would be able, with reasonable alterations, to use the existing system, the system is a structural component; if the existing system essentially would have to be scrapped, it qualifies for the investment tax credit. The issue involves many other taxpayers, and I would grant certiorari to resolve this conflict.

*Commissioner v. Illinois Cereal Mills,* 479 U.S. at 995, 107 S.Ct. at 601.

This court does not feel that a relaxed interpretation of the promulgated regulations is appropriate, and notes that the cases cited by the plaintiff which advocate such an approach are not binding on this court. This

court does not believe it is appropriate to narrow the definition of the everyday terms included in the statute and regulations in order to elude the 1982 decision of the Commissioner when he disallowed plaintiff's 1978 and 1979 claims for the tax credits.[9] Moreover, in the above-captioned case, it is evident from the portion of the transcript quoted below, and the record in this case, that even under the more expansive definitions of creditable property adopted by the *A.C. Monk* and *Illinois Cereal Mills* cases, this plaintiff fails to present sufficient, coherent, or reliable evidence to substantiate its claims.

### SUBSTANTIATION

▉ When claiming an alleged overpayment of taxes by virtue of disallowed investment tax credits, the plaintiff taxpayer bears the burden of establishing both the date the property was "placed in service" as well as "the amount of the credit claimed." *Sartin v. United States*, 5 Cl.Ct. 172, 179 (1984); *see* I.R.C. § 46(c)(1); *Visser v. Commissioner*, 65 T.C.M. (CCH) 1734, 1738, 1993 WL 3970 (1993). "It is not enough for him [the taxpayer] to demonstrate that the assessment of the tax for which refund is sought was erroneous in some respects." *United States v. Janis*, 428 U.S. at 440, 96 S.Ct. at 3025. A taxpayer's evidence must also be sufficient to show that the amount at issue in the refund action was improperly charged by the Commissioner. *See Helvering v. Taylor*, 293 U.S. at 514, 55 S.Ct. at 290. Plaintiff must substantiate its claim with evidence sufficient to establish entitlement to the investment tax credit claims, including all evidence leading to a reasonably accurate valuation of the property during the tax years in question. *See Sartin v. United States*, 5 Cl.Ct. at 177;

*L.W. Hardy v. United States*, 1 Cl.Ct. at 465–66, 471. The consequence of lack of evidence on a material element of the tax credit claimed is that the taxpayer's claim is to be rejected. *Sartin v. United States*, at 177 (citing *Burnet v. Houston*, 283 U.S. 223, 228, 51 S.Ct. 413, 415, 75 L.Ed. 991 (1931)).[10]

▉ Moreover, testimony based on documents which allegedly once existed, but which were subsequently destroyed, is insufficient to establish the plaintiff's claim. *Liddy v. Commissioner Of Internal Revenue*, 808 F.2d 312, 315 (4th 1986), *reh'g denied*, 815 F.2d 1007 (4th Cir.1987); *see also Jupiter Corp. v. United States*, 2 Cl.Ct. 58, 71 (1983). Similarly, summary appraisals based on non-contemporaneous records, or data reconstructed from accidently lost or destroyed documents, are unpersuasive when the value of the property cannot be reliably ascertained. *See Jupiter Corp. v. United States*, 2 Cl.Ct. at 71. Nor can taxpayer's estimate assumptions, based on guesses without supporting records, form the basis for acknowledgement of a plaintiff's claim. *L.W. Hardy v. United States*, 1 Cl.Ct. at 470–71.

▉ The methodology employed by plaintiff, in the instant case, for presenting and substantiating the costs of allegedly creditable section 38 property was, at best, unusual. On direct examination by plaintiff's counsel Mr. Power, the witness, William Robert Jones, Property and State Income Tax Manager for Boddie–Noell Enterprises, described the system by which plaintiff initially made its claim for investment tax credit:

[MR. POWER]

Q Did you prepare in the course of your responsibility the investment tax credit for the years in issue in this case?

9. The court notes that the Internal Revenue Service subsequently announced on October 22, 1991, a Revised Action on Decision that, in appropriate circumstances, it would no longer challenge using the allocation approach. However, this occurred well after the 1978 and 1979 tax years at issue and the 1982 disallowance of plaintiff's claim in 1982.

10. In general, there should be some direct evidence from which reliable estimates of property value may be made; absent such, testimony based on this evidence is unpersuasive. In *Sartin v. United States*, 5 Cl.Ct. at 178, a general

ledger, without cash receipts and disbursement journal, paid bill files or unpaid bill files to trace the monthly postings, and some check stubs were found insufficient when a taxpayer should have kept a daily record. In *Rosenberg v. United States*, 3 Cl.Ct. 432, 437 (1983), plaintiff's valuation of property based solely on his imperfect, personal recollection was found insufficient. In *L.W. Hardy v. United States*, 1 Cl.Ct. at 470–71, estimates based on what an accountant believed was reasonable and not based on supporting contemporaneous records were found unreliable.

[MR. JONES]

A Yes, I did.

Q And what kind of a claim did you make or let me ask you first, how did you go about making your claim for investment tax credit?

A During the time period there was a lot of activity within the restaurant industry related to investment tax credit. Cost segregation studies were being performed at Hardee's Food Systems. They provided us with a summary of one of their studies which showed the 24 percent of their restaurants studied qualified for the investment tax credit. At the time period, J.W. Turner and I were involved. J.W. Turner was involved as the chief engineer and I was involved with the tax preparation process. We attended one of George Hamilton's Company's cost segregation programs. Then from that point we came back and proceeded to identify on our plans items that we thought would be eligible for the investment tax credit. It was a detailed process really marking and outlining the plans. A percentage was derived from that process. Based on J.W. Turner's expertise with our plans as our chief engineer and my concurrence with those estimates we deemed that certain line items, particularly ceiling tile, electrical, plumbing, heating and air conditioning and I think portions of the concrete through the drive-thru window, we identified those items as eligible for the investment tax credit.

Mr. Jones, in his testimony on direct examination testified that the amounts claimed for investment tax credit were the result of the application of cost segregation studies created by George Hamilton to the plans of Boddie–Noell units. By marking and outlining plans, Mr. Jones, working with J.W. Turner, Boddie–Noell's Chief Engineer, estimated that certain items were eligible for the investment tax credit. From this process, Mr. Jones and Mr. Turner derived a percentage of creditable costs.

Upon cross-examination, however, Mr. Jones conceded that Exhibits 1013 and 1014, the substantiating documents offered by plaintiff, did not contain all the invoices for the units at issue,[11] and that handwritten

11. [MR. FRAHM]
Q You have them both. That's the cost documentation that Plaintiff is relying on in this case?
[MR. JONES]
A That's correct.
Q And you provided the documents within those Exhibits, 1013 and 1014, to Mr. Hamilton for the seven specific units he studied?
A That's correct.
Q He relied on those documents in his analysis?
A Yes, sir, he did.
Q Mr. Hamilton had no other cost documentation of Plaintiffs did he?
A No, sir, to my knowledge he did not.
Q He did not. When you apply the results of Mr. Hamilton's studies to unstudied units you used this same cost information in 1013 and 1014 didn't you?
A Yes, sir.
Q No other document, no other cost documentation?
A To my knowledge, no.
Q Let's talk about contents of Exhibits 1013 and 1014 a little bit. For each restaurant the documentation can be thought of as being in two parts. The first part being a handwritten sheet or sheets and the second part being some invoices or other substantiating or supporting documents. Is that correct?
A That's correct.
Q Is that accurate. And you contend, I believe, that the handwritten sheets set forth costs incurred based on other documents that are attached?
A Yes, sir, that's correct.
Q So anywhere there is a number on the handwritten sheet there should be support for it in the supporting documentation. Is that what you were saying?
A There are instances within the documentation that reference journal entries, that reference back to our general ledger entries that follow through to the depreciation schedules, that these specific invoices are not included.
Q Let me ask the question very precisely so that we are all clear on it. If there is a number in the handwritten sheet would one find support for that handwritten number, that number on the handwritten sheet in some form in the supporting documents attached?
A Not in the supporting documents attached. But, in the, if you say attached, not in this exhibit. But, they can be referenced back to the depreciation schedules.
Q Everyone of them?
A Maybe in summary. Maybe not specific line item journal entry invoices. They would not be—but in summary the items for construction costs should be able to be referenced back to the depreciation schedules.
Q But not to the supporting document.
A When you say supporting documents—
Q The supporting documents in Exhibits 1013 and 1014.

sheets included therein were prepared by Mr. Jones, after the close of the fiscal year,[12] for the purpose of calculating plaintiff's investment tax credit claims. Furthermore, Mr. Jones conceded, on cross-examination, that the handwritten sheets, included in exhibits 1013 and 1014, expressed plaintiff's point of view as to the amount and character of the expenditure as creditable or non-creditable.[13] Thus, Mr. Jones testified that the handwritten sheets, unlike cost ledgers sheets, did not constitute a mechanical tran-

scription of bills, but rather expressed the point of view of the writer as to which items were eligible for the investment tax credit.[14]

The percentage of creditable expenditures for the tax years in question in the instant case was also derived in part from responses obtained by selected contractors to questionnaires developed by plaintiff, none of which were in the possession of plaintiff:

[MR. FRAHM]

Q All right. Who principally developed the percentages? The 95 percent,

A Not in every instance. They would not reference in journal entries or things of that nature. No, sir.

Q So there would be instances where if one were looking through Exhibits 1013 and 1014 for any particular restaurant where one would look at the handwritten sheet and find a number and then look at the supporting documents and not find support for that number?

A That's correct.

Q You would acknowledge that that happens?

A I would.

Q Would you acknowledge that that happens frequently?

A Yes, I would in the summary, yes.

12. [MR. FRAHM]

Q And they were all prepared at about the same time, weren't they?

[MR. JONES]

A Yes, sir.

Q They were all prepared after the tax year was over but before the return for that year was filed?

A They were prepared before the return were filed.

Q They were not prepared as construction progressed in each particular unit then?

A No, they were not.

Q That seems to follow since they were prepared after the tax year had ended that they were not being prepared as the units were being constructed or immediately after the—

A Because all were placed in service prior to the year end.

13. [MR. FRAHM]

Q So the handwritten sheets didn't simply recite cost information that was found elsewhere but, instead it also expressed your point of view as to what was eligible for the investment tax credit?

[MR. JONES]

A That's correct.

Q So you were expressing your claim, if you will, in these handwritten sheets? You were advocating a particular claim in these handwritten sheets?

A Yes, sir.

14. [MR. FRAHM]

Q All right. Now as an accountant you are familiar with ledgers?

[MR. JONES]

A Yes, sir.

Q For an example a ledger would be prepared by a bookkeeper or an accountant in a generally contemporaneously manner as expense are incurred?

A That's correct.

Q And cost would simple be mechanically recorded as they come in? A bill would come in, it would be put into the ledger, correct?

A It depends on the particular type of bills that you are talking about. If you are talking about a restaurant expense bill related to the restaurant operation, that's correct. If you are talking about a construction bill that would be assembled in a construction and progress account which is not a fixed asset account.

Q But it would be recorded in some manner as the cost, as the bill came in?

A That's correct.

Q That would be done as a routine and regular manner?

A Yes, it would.

Q And that routine, regular manner is what makes ledgers and similar routine accounting records reliable?

A Yes.

Q They are just done on a routine, regular basis.

A That's correct.

Q But, in contrast, your handwritten sheets were simply prepared after the year ended and after construction had ended or pretty much at the same point of time?

A It was after the year end. That is correct. And all tax return schedules are not prepare on a go along basis and you accumulate the data you put them down—

Q I wasn't suggesting it was. I'm contrasting the handwritten sheets you prepared with a ledger that is prepared as cost generally are incurred and what you prepared with your handwritten sheets after costs were incurred. And that's correct?

A That's correct.

Q And the handwritten sheet, again, was prepared in order to express your point of view as to what was eligible for the investment tax credit?

A That's correct.

the 95 percent, the 75 or 60 percent, you or Mr. Turner?

[MR. JONES]

A Well, we did it jointly together but he had the final say on the estimated percentages?

Q He was the final say on developing the percentages himself?

A It was an informal calculation, not calculation. We worked informally on the project. The estimate was derived and I concurred with it. I saw no reason based on industry standards to have any other opinion on it.

Q You must have done some sort of computation to come up with these 60 percent, 75 percent, though. Correct?

A We submitted to some contractors that we were using at the time a line item type of analysis, if you will, listing various circuitry on the electrical and asking them to fill in the blanks and we calculated it and it was reasonable compared to our estimated percentages.

Q All right, so you sent out some kind of questionnaire, you say, during the years at issue to contractors?

A That's correct.

Q And they would fill in cost information on that. Do you have any of that documentation here today?

A We do not have any for the years at issue.

Q For the years at issue you do not?

A We do not.

Thus, plaintiff introduced a redacted questionnaire submitted to contractors for another year, and Mr. Jones testified that the questionnaire admitted into evidence was identical to the one sent to contractors for the years at issue.

In instances, however, where plaintiff could not develop percentages of creditable expenditures by the above methodology, for lack of any invoices or other cost information from which to derive a proportion, plaintiff relied on a study of its restaurants by Hardee's Food Systems, Inc. The Hardee's study apparently concluded that 24 percent of total costs of an individual restaurant were creditable. Thus, for FYE 1978, plaintiff

simply multiplied total costs at a restaurant by 24 percent and claimed that amount as a creditable expenditure:

[MR. FRAHM]

Q We spoke a few minutes ago about this Hardee's study in which you would take 24 percent against the total cost here?

[MR. JONES]

A Yes.

Q And that was based on a study that was done by Hardee's. Was that done for Boddie–Noell's restaurants or for Hardee's restaurants?

A It was done on a typical Hardee's restaurant.

Q Not Boddie–Noell's?

A Not on Boddie–Noell. It was done for a typical Hardee's restaurant and the communication was sent out to all Hardee's franchisees who were building restaurants based on the Hardee's prototype at the time.

Q You were not a participant in that study in any way?

A No, I was not.

Q You did not review the results of that study? You did not review the details on that?

A I did not review the detail, that's correct.

Q You merely accepted it and used it yourself?

A That's correct.

For FYE 1979, plaintiff increased the percentage used in its computations to 25 percent, despite a lack of documentation or study to show that 25 percent of total costs at the restaurants were creditable:

[MR. FRAHM]

Q And in 1979 you increased that percentage to 25 percent?

[MR. JONES]

A Yes, I did.

Q And there is no Hardee's study that ever indicated that 25 percent was an appropriate percentage?

A There was never a Hardee's study that said 25 percent, that's correct.

Q You increased that on your own?

A Right.

Q Do you have any documentation in Court today to support that increase?

A No, I do not. There were additional Hardee's studies made. The 24 percent was related to a new restaurant. Additional Hardee's studies were made by evaluation companies that showed that new construction qualified 32 percent. Remodeled construction approximately 25 percent and drive-through construction was approximately—

Q Did any of that documentation concerning new studies by Hardee's in Court today?

A I do not have any, no, sir.

After the filing of the instant lawsuit, plaintiff retained George Hamilton to reconstruct the costs incurred at seven of plaintiff's restaurants:

[MR. FRAHM]

Q Let's return again to Boddie–Noell's in-house study under which he had calculated his investment tax credit claim. After the claims were disallowed by Internal Revenue Service you protested those claims, correct?

[MR. JONES]

A That's correct.

Q And then subsequently you filed the claims for refund?

A That's correct.

Q And subsequently you filed your suit?

A That's correct.

Q And at the time of filing your suit you were still relying on this in-house study, correct?

A That's correct.

Q And for at least a year after the suit was filed you were still relying on that in-house study to support your investment tax credit plan?

A That's correct.

Q And then along came Mr. Hamilton, correct?

A Well, we came along finding Mr. Hamilton.

Q You found Mr. Hamilton and now you are no longer relying that in-house study?

A That's correct.

Q So for 13 years approximately from the time construction commenced and was undertaken and was concluded until you filed suit for a year after suit you were relying on information that you are no longer relying on today, correct?

A That's correct.

Q It was only after I raised a question about the support for Boddie–Noell's claims that you hired Mr. Hamilton, isn't that correct?

A In the course of our conversation our goal early on was to be able to explain to you our methodology all the way throughout. It became early on that you were, that we were not being able to provide, based on our documentation or our in-house study, so we thought an expert study would provide that information and give you a little more comfort with the data.

Q So in plain language I wasn't buying your first implication and now you came up with different information? Correct?

A Well, in plainer language we though we would be able to give you a little bit better information that you could make a determination on.

Q All right. So in that sense I prompted Mr. Hamilton's study?

A You prompted the study in reference to this case. Arthur Consulting had previously worked on studies for our restaurants which were a different concept.

The units analyzed by Mr. Hamilton, Gastonia, Red Springs, Lumberton, Rockford, Danville, West Main, and Portsmouth, were the basis for a study which Mr. Hamilton conducted in 1990 to reconstruct costs allegedly incurred by plaintiff in FYE 1978 and 1979 at all of its units. The methodology Mr. Hamilton used relied on the cost information contained in Exhibits 1013 and 1014, from which he determined known subcontract costs. Then, Mr. Hamilton marked the blueprints, the costs of items or "take-offs" which needed to be determined, and grouped them

into assets and into the subcontracts to which they were attributable. After identifying the "take-off" items, Mr. Hamilton proceeded to estimate the cost of such items based upon either available documentation or the Means Estimating Book, a reference used by contractors to prospectively estimate the cost of a project for bidding purposes. Thereafter, Mr. Hamilton proceeded to adjust these estimates to reconcile the totals in each category with the known amount spent in a particular subcontract category, further adjusting the estimates to reflect plaintiff's records for indirect costs. Mr. Hamilton, then characterized assets within each subcontract category as creditable or non-creditable. Finally, Mr. Hamilton generated percentages, providing the final allocated costs for each of the items for which plaintiff seeks a tax credit.

Defendant, in its post-trial brief, has raised several objections to the accuracy of the results of the above described methodology. First, defendant asserts that it is simply impossible for Mr. Hamilton, in 1990, to accurately reconstruct costs incurred by plaintiff in FYE 1978 and 1979. In support of this, on cross-examination, defendant elicited testimony from Mr. Hamilton that by 1990, none of the units was in the same condition as during the years at issue, and that Mr. Hamilton did not visit any of the studied units. Defendant elicited further testimony from Mr. Hamilton to the effect that Mr. Hamilton had worked primarily with Ms. Tracy Power, one of plaintiff's counsel, and that his only direct contact with Boddie–Noell was with Dennis Bost, who was not employed by plaintiff until six years after the construction or renovation of the units at issue. Thus, defendant contends that the study conducted by Mr. Hamilton was removed by both time and distance from the environment in which the restaurants were constructed.

In addition, defendant contends that the cost of the vast majority of takeoffs was estimated utilizing the Means Estimating Book. Furthermore, Mr. Hamilton, in his testimony, acknowledged that the Means books he used for these studies frequently did not list a cost for the particular takeoff that he was attempting to estimate, requiring that he use an entry for a similar property item, and adjust the cost. This process added yet greater uncertainty to a methodology that was already based on estimates and extrapolation.

Defendant's expert witness, Lawrence F. Gaffney, also testified credibly as to several weaknesses in plaintiff's study which raise doubts as to the sufficiency and accuracy of such results as a basis for substantiating plaintiff's claims. Mr. Gaffney first noted that the preparation of an accurate study so long after the completion of construction is simply impossible. For example, the bidding climate in North Carolina and Virginia during the construction period at the time could not have been taken into account using plaintiff's methodology. The state of the construction market at the time of the bidding for the units in question is an important element of price that simply was not contemplated in plaintiff's study and thus makes it less reliable as a basis for the substantiation of plaintiff's claims.[15] Furthermore, Mr. Gaffney testified as to his finding that the study conducted by Mr. Hamilton improperly allocated indirect costs to estimated takeoffs. For example Mr. Gaffney testified that general contractor labor, a significant cost item, constitutes work a general contractor is specifically obligated to perform, and is not properly attributable to other categories of expenses. Nevertheless, Mr. Gaffney testified that Mr. Hamilton's study improperly attributed excavation or other site work to HVAC, electrical, and other categories of allegedly creditable expenses.

Defendant contends, and this court agrees, that the studies of the seven units and, thus, the extrapolation of these results to remaining units, are based on the questionable assumption that costs may be reconstructed twelve years after construction by reference to Means Estimating Books and documents that make no reference to

---

**15.** A period of strong demand for construction materials and services and limited supply would have a upward influence on cost whereas, weak demand and abundant supply would tend to de-

press prices. These are important variables for determining cost, which were not dealt with in plaintiff's study.

the items of expenditure which plaintiff alleges were incurred and should be credited for section 38 credit. For this court to make an award based upon the methodology by which plaintiff seeks to substantiate its claims, and without books and records sufficient to allow calculation of the multiple deductions claimed, would constitute approbation of speculation, without forcing the plaintiff to rebut the presumption of correctness of the Commissioner's findings, and presents no basis on which this court could determine whether plaintiff was entitled to the credits claimed. As discussed above, the consequences of a lack of contemporaneous evidence on material elements of plaintiff's instant claims for tax credit is that the taxpayer's claims should be rejected. The evidence adduced by plaintiff, by means of the estimates generated by Mr. Hamilton's study, is far too unreliable. The results of the study appear to be based primarily on after the fact speculations by Mr. Hamilton and Mr. Jones.

*Suspended Ceilings*

██ Plaintiff asserts that the suspended ceilings installed in the kitchen food processing and servicing areas of its restaurants are creditable section 38 property. However, based on the applicable regulations and case law, this court concludes otherwise. Treas. Reg. § 1.48–1(e)(2) explicitly states: "[t]he term 'structural components' includes such parts of a building as walls, partitions, floors, and ceilings ..." Furthermore, this rule has been applied explicitly to exclude suspended ceilings from eligibility for section 38 credit. *Texas Instruments Inc. v. Commissioner,* 63 T.C.M. 3070, 3073–75, 1992 WL 110779 (1992); *Metro National Corp. v. Commissioner,* 52 T.C.M. 1440, 1447, 1987 WL 40120 (1987).

In effect, the plaintiff's argument attempts to persuade the court to follow the test adopted in the *Scott Paper Co.* and related cases discussed above. The suspended ceiling was the topic of substantial trial testimony offered by Dennis Bost on behalf of the plaintiff. Mr. Bost, who was the Vice–President of Design and Construction of Boddie–Noell, stated:

[MR. FRAHM]

Q Let's talk about the ceiling tile.

The dropped ceiling in Boddie–Noell's restaurant was installed by a series of wire hangers and runners, correct?

[MR. BOST]

A That's correct.

Q And the wires were installed into the ceiling joists.

Could you describe what a ceiling joist is? Maybe we'll start with that.

A It's a joist.

A joist is a generic term—

Q A joist is a joist, but what is a joist?

A A joist is a generic term: it can be a concrete joist, it can be a wood joist, steel joist whatever, but generally it's the roof structure that supports the debt to the restaurant.

Q All right, this wire hanger would be installed into that joist whether it was a steel joist, a concrete joist or a wood joist?

A That's correct.

It would be attached to the joist or the structure.

Q And then from that you would have the series of runners—

A Run channels, that's correct.

Q And then in that you would insert the tile?

A The lay in tile, yes.

Q And those tiles are typically two feet by two feet or two feet by four feet?

A That's correct.

Q And the ceiling was installed in the same manner in the kitchen area as it was in the rest of the restaurant?

A Installation is basically the same.

Q It is the same regardless.

The only difference is that you used a smooth tile in the kitchen and a not so smooth tile in the other areas?

A That's correct.

Q Boddie–Noell needs to have a suspended ceiling throughout its restaurants so that it has access to plumbing and access to electrical and access to duct work for maintenance purposes?

A Well no, actually it needs it to protect it from all the maybe dirt and grime that may drop off of that onto preparation equipment or the food itself or the customers.

It's not, unless you specifically design a building for those to be exposed you have to find some way to contain it.

Q That's right, and it also provides you with maintenance access to the plumbing lines and the electrical lines and the duct work?

A That's correct.

Q So the function of the suspended ceiling in Boddie–Noell kitchens and dining rooms is identical except that in addition in the kitchen you have smooth cleanable tile, but otherwise the functions are the same?

A Yes.

Q you could meet the Code Requirements that you refer to for smooth, cleanable surface by having a wall board ceiling and just painting it with glossy paint, couldn't you?

A We've tried that and again what we have found is it does not meet all the requirements because what happens is paint over a period of time starts to chip, flake, peel.

In fact, we use very little painted surfaces in the interior.

In fact, today we use none that I know of.

Q But there are some in some of your restaurants?

A They're older restaurants and those, if I had to guess right now, we don't hesitate to change those out.

Q All right, but there have been, during the years at issue, wallboard ceilings that are painted with a glossy surface in the general kitchen area?

A I do not know.

I don't know for the years at issue that those systems exist.

I can tell you that we do use, in the restrooms, we do use hard, gypsum ceilings to—

Q You testified to that so you cannot say that the blueprints admitted into evidence do not contain evidence that there are wallboard ceilings in the general kitchen or serving area?

A The blueprints that I've seen and the ones that we're looking at today all indicated there's an acoustical lay-in ceiling.

Q Everywhere throughout the kitchen area and serving area?

A That's correct except for the cooler: it's a self-contained box.

It has its own roof system or ceiling system.

The testimony of plaintiff's witnesses, including the sections quoted above, leads this court to conclude that the ceilings at issue should be considered covered by the intended definition of "structural component" as is clearly stated in Treasury Regulation § 1.48–1(e)(2), and do not merit a tax credit even under a narrowed interpretation of "structural component." The suspended ceilings placed in the kitchen of plaintiff's restaurants, therefore, are not creditable section 38 property. Plaintiff's tax credit claims for suspended ceilings with respect to all of the restaurant units at issue in the instant case, therefore, are denied.

*Exterior Mansard–Marlite Roof Panels*

■ The parties have agreed that the orange mansard panels clipped to the restaurant building are identity symbols designed to distinguish plaintiff's Hardee's restaurants. From this, plaintiff, however, has drawn the conclusion that the panels are not structural components of the restaurant building and are, therefore, creditable section 38 property. In support of this characterization, plaintiff contends that the panels are identical to false balconies, exterior ornamentation or other identity symbols which have no more than an incidental relationship to the operation or maintenance of the building. Based upon a review of the applicable regulations and the testimony at trial, however, this court disagrees. Treas.Reg. § 1.48–1(e)(1) explicitly states:

The term "building" generally means any structure or edifice enclosing a space within its walls, and usually covered by a roof, the purpose of which is, for example, to provide shelter or housing, or to provide

working, office, parking, display, or sales space.

Treas.Reg. § 1.48–1(e)(1). Furthermore, the structural components that comprise this structure include: "such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent covering therefore such as paneling or tiling; windows and doors, ..." Treas.Reg. § 1.48–1(e)(2). The trial record reflects that the mansard roof panels in question are properly included in the above categories, not only because they are placed on the roof structure of the building, but also because of their functional purpose of keeping out the elements. The testimony of defendant's expert witness Lawrence F. Gaffney stands unrebutted in this regard:

[MR. FRAHM]

Q Okay. Let's talk about what the plaintiff has referred to as marlite panels or porcelain panels or orange core lock panels, are you familiar with those?

[MR. GAFFNEY]

A Yes.

Q What—can you describe what those are?

A They are a composition of I guess loosely termed plastic composition that is supplied by the Marlite Company for use whatever the application is.

Q Let me show you joint exhibit—I believe it's 2. It's in that book right there.

\* \* \* \* \* \*

Q Would you turn to page two of that exhibit. Does that depict your understanding of what these orange panels are?

A Yes, the exterior one.

Q Can you explain those?

A Oh, excuse me—I was over here. Yes, it depicts the exterior marlite that I can see.

Q Can you explain how those would be attached to the building?

A It's my recollection in looking at the drawings it's attached to a clips to a—to a structural support.

Q All right. Now what would happen if you removed those? What would happen to the integrity of the building?

A Again my recollection from the drawings is that there is in the case of the exterior it would leave an opening in the building envelope. There is nothing back backing it up that I could see.

Q And then what would happen?

A You would—you would loose [sic] your—there would be an exchange between the outside an [sic] inside of you [sic] air condition—if you lost your air conditioning.

Q If you lost your air conditioning—

A Yeah, it—.

Q And what if it's raining?

A Well, again it's so soft that you might—you might not get much water but you would get humidity. The vertical ones you would get rain. Depending on the direction of the rain.

Q All right. Now the plaintiff has characterized these as serving the function of identifying the building and indeed the defendant has stipulated that they identify the building, but apart from that, did these serve some sort of building function then? Concerning the environmental integrity of the building?

A Well, okay—I—could you just repeat the request question because I.

Q Sure?

A I interpret the question to mean other than identification does it serve a purpose.

Q Yes, exactly.

A I said—I said that it's part of the building envelope. It's integral to the building envelope and—

Q You are much more artful than I am. If they were to be removed by Boddie–Noell, when it left the building, if it sold the building to someone else, would the new owner have to put something on there to replace those?

A Unless he was running an open air something—I'm sorry, I shouldn't be so jocular.

Although the parties have agreed that the orange mansard panels clipped to the restaurant building also act as identity symbols, designed to distinguish plaintiff's Hardee's

restaurants, plaintiff erroneously concluded that the panels, therefore, are not structural components of the restaurant building. The testimony of defendant's expert witness convinces the court otherwise. This court, therefore, concludes that the orange marlite mansard panels are structural components of the restaurant buildings and, thus, are not creditable section 38 property. Plaintiff's tax credit claims for exterior marlite mansard panels with respect to all of the restaurant units at issue in the instant case, therefore, are denied.

*Electrical and Plumbing*

■■ There appears to be no factual dispute that the claimed electrical and plumbing items remaining before the court for adjudication are limited to those "connected directly to equipment" and "portions of its panel boards (circuit breaker boxes), circuit breakers electric wiring, conduit, junction boxes, and outlets that serve its equipment." The question, therefore, is whether the items claimed are non-structural components, and, furthermore, if not structural in character, whether the claimed items are creditable section 38 property. Plaintiff contends that all of the items subsumed under the these two categories are non-structural in character and, therefore, are properly characterized as tangible property subject to the tax credit provisions of section 38. The unambiguous language of the applicable statute and regulation requires this court to conclude otherwise. Treas.Reg. § 1.48–1(e)(2) explicitly states:

> (2) The term "structural components" includes such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent covering therefore such as paneling or tiling; windows and doors; all components (whether in, on, or adjacent to the building) of a central air conditioning or heating system, including motors, compressors, pipes and ducts; *plumbing and plumbing fixtures,* such as sinks and bathtubs; *electric wiring and lighting fixtures;*
> . . .

Treas.Reg. § 1.48–1(e)(2) (emphasis added). Thus, the electrical and plumbing items agreed upon by the parties as constituting the claim are structural. Treas.Reg. § 1.48–

1(c) when defining tangible personal property specifically states:

> For purposes of this section, the term "tangible personal property" means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures).

Treas.Reg. § 1.48–1(c). Furthermore, Treas.Reg. § 1.48–1(d) in defining other tangible property unequivocally excludes structural components:

> (d) *Other tangible property*—(1) *In general.* In addition to tangible personal property, any other tangible property (but not including a building and its structural components) used as an integral part of manufacturing, production, or extraction, or as an integral part of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services by a person engaged in a trade or business of furnishing any such service, or which constitutes a research or storage facility used in connection with any of the foregoing activities, may qualify as section 38 property.

Treas.Reg. § 1.48–1(d).

After reviewing the trial testimony, this court agrees with the defendant that the record does not demonstrate that the electrical and plumbing equipment installed by plaintiff is inextricably limited to particular equipment or is functionally unrelated to the operation or maintenance of the building. Thus, even if the court adopted the expansionist tests discussed above, the electrical and plumbing items identified by the plaintiff should not be considered creditable as section 38 property. Plaintiff's tax credit claims for electrical and plumbing items are denied with respect to all of the restaurant units at issue.

*HVAC*

■■ Plaintiff claims that the portion of its heating ventilating and air conditioning (HVAC) system that serves the kitchen

area [16] in its restaurants is eligible for the investment tax credit as section 38 property. In support, plaintiff argues that the HVAC systems, which otherwise would be considered structural components of a building, and, thus, not eligible for the tax credit, should be considered eligible under the sole justification exception in Treas.Reg. § 1.48–1(e)(2), which excludes such machinery from the definition of structural component if the sole justification for its installation is to assist in the operation of the taxpayer's equipment, they qualify as credit eligible.

In *Publix Supermarkets, Inc. v. United States*, 26 Cl.Ct. 161 (1992), this court has previously addressed a claim for investment tax credits for installation of an HVAC system, pursuant to the applicable statutory and regulatory framework. In *Publix*, this court analyzed earlier cases, including *Piggly Wiggly Southern, Inc. v. Commissioner*, 84 T.C. 739, 750, 1985 WL 15341 (1985), *aff'd*, 803 F.2d 1572, 1574 (11th Cir.1986); *Fort Walton Square, Inc. v. Commissioner*, 54 T.C. 653, 1970 WL 2220 (1970); and *Morrison Inc. v. Commissioner*, 51 T.C.M. (CCH) 748, 1986 WL 21844 (1986), *aff'd*, 891 F.2d 857 (11th Cir.1990). The *Publix* case dealt specifically with the issue of whether the "sole justification" for the installation of an HVAC system in plaintiff's food stores was to meet the temperature and humidity requirements of items of machinery, refrigerated food cases, located in the Publix stores. In reaching its decision, this court examined the scope of the regulations' exception to the general definition of "structural components," set forth in Treas.Reg. 1.48–1(e)(2), as follows:

> However, the term "structural components" does not include machinery the sole justification for the installation of which is the fact that such machinery is required to meet temperature or humidity requirements which are essential for the operation of other machinery or the processing of materials or foodstuffs. Machinery may meet the "sole justification" test provided

by the preceding sentence even though it incidentally provides for the comfort of employees, or serves, to an insubstantial degree, areas where such temperature or humidity requirements are not essential. For example, an air conditioning and humidification system installed in a textile plant in order to maintain the temperature or humidity within a narrow optimum range which is critical in processing particular types of yarn or cloth is not included within the term "structural components".

*Id.* (citing Treas.Reg. 1.48–1(e)(2)). In its interpretation of Treas.Reg. 1.48–1(e)(2), the court concluded:

> Under the Regulation, the question is not whether the refrigerated display cases would operate more efficiently or more economically with an HVAC system; rather, the question is whether the McQuay HVAC system was "essential" to meet temperature or humidity requirements so that the Hill refrigerated display cases would operate. *See Circle K Corp. v. Comm'r*, 51 Tax Ct.Mem.Dec. (P–H) para. 82,298, at 1265 (1982). Moreover, even if this court determines that the McQuay HVAC systems were required for the operation of the plaintiff's Hill refrigerated display cases, if installation of those systems also provided for the comfort and health of the plaintiff's customers and employees, the court concludes that the "sole justification" exception will not apply, unless providing comfort and health was a benefit incidental to the operation of those refrigerated display cases. *Id.* at 1265.

*Publix*, 26 Cl.Ct. at 169.

In the instant case, the testimony of plaintiff's witness, George Hamilton, on direct examination, includes a lengthy discussion of the intricacies of the design of the Boddie–Noell HVAC system, and the methodology by which the plaintiff tried to justify allocating the cost of HVAC to the kitchen from other areas of the restaurant. Unfortunate-

---

**16.** In its post trial brief, plaintiff further clarifies that its claim, entitled "HVAC" includes the "cost associated with restaurant exhaust fans, can wash exhaust fans, make-up air fans, french fry exhaust fans, breakfast grill exhaust fans, main exhaust fans for the charbroiler, roof ex-haust, and exhaust for the hood over the cooking elements in the restaurant." Plaintiff, however, limits its claim to the "separate and distinct HVAC components and related duct work serving the kitchen areas."

ly, Mr. Hamilton's testimony, which the plaintiff offered as expert testimony, was not clearly presented, nor was it persuasive regarding why the HVAC systems at issue were eligible for the investment tax credit as claimed, for example:

[MR. POWER]

Q I am going to direct your attention to some latter pages in these blueprints, and ask you drew [sic] some conclusions.

With respect to the coding on the HVAC diagram, and I assume there is one here?

I am directing your attention to M–1 of the same exhibit.

Would you explain the items that are marked in yellow on this exhibit on page M–1?

[MR. HAMILTON]

A The items marked on Exhibit, or in the Drawing M–1.

Q Drawing M–1.

A Yes, consist of heating, ventilation and air conditioning components contained within the structure.

They are made up of roof top air conditioning units, and as you can see on the drawing, with a little double underline, there is air conditioning at number one, two, three, four and five.

Each of these units has—we are looking from the roof, through the roof, straight down into the facility. And the center of each of these is, in fact, the air conditioning system, the small box, the dotted line box.

Radiating from that, either colored in yellow, or colored in pink, is the duct work. The duct work is sheet metal duct work.

In each piece of duct work is the duct work size, ten inches by ten inches, 18 inches diameter, 12 inches by eight inches. It gives the various sizes within that.

At the truncation point of each piece of this duct work, you will see a box with a small symbol, either the letter A, B, C, D, E, F, G, all the way down the line, and what that is, is at the lower right hand corner of this particular drawing is a schedule. And that schedule shows the grills and diffusers.

And what we're looking at is the size of the duct work. In the fifth column marked "CFM" is the cubic feet per minute of air, which goes through that particular truncation point.

In doing the analysis, what we did is we looked at the location of these particular units and the areas that they serve.

The areas that were served, the pink ones on the far right hand side of the drawing, AC units four and five are in the seating areas colored in pink because those all go into asset, in this case, 3700, which becomes the building air conditioning system.

In the yellow on the left hand side of the drawing is air conditioning units 1, 2, and 3. These air conditioning units are serving the areas back where the cooking equipment is and providing cooling to the areas, to offset the heat given off by the cooking equipment, both the vented cooking equipment, and the unvented cooking equipment.

Where we found air conditioned units, in this particular case, I will address you over to air conditioning unit number one at the far left hand side. That particular unit fed two distinct items.

One, it fed down into the cooking area, providing cooling over the cooking equipment. And two, it also provided duct work back to the office, and to the washroom areas.

And in those particular instances, you will see where we've covered that duct work in pink, which means that that was building related.

In calculating then, the amount of a particular unit, which would either go in Column A or Column B, Column A being accessorial or personal property in nature—we'll call it accessorial, non-building related—if they're colored in yellow, as you see with units two and three, are providing cooling specifically to those areas where there's heat being given off by the cooking equipment.

Where you have the dual areas, what we've done is we've applied an allocation test, and that allocation test was, as we looked at each piece of duct work and the

cubic feet per minute of air which is given off to that area, we've compared what is considered the building areas, which would be the building, and the office, and the support areas, on the upper left hand side of this drawing, to those areas which are feeding specifically down into areas where they're offsetting the heat loads being given off by the various pieces of equipment.

Therefore, on air conditioning unit number one, we've applied a percentage test to determine what percentage of air conditioning number one is providing building cooling, and what percentage of it is providing cooling to offset the heat loads given off by the vented and unvented cooking equipment.

To go further, in our report, when you look at the take-off numbers under the assets, you will see, for the costs of air conditioning unit one, you will see a percentage number in the quantity column.

We have calculated what percentage of air conditioning number one has to do in the accessorial area versus the building area, and only classified, therefore, in either the asset marked building, or the asset marked Assets 6103, that portion of that particular unit.

Mr. Hamilton further testified as to his proposed methodology for determining what percentage of the HVAC is dedicated to providing cooling for the comfort of the entire building and what percentage is related to activities in the kitchen:

[MR. POWER]

Q Mr. Hamilton, I would like to direct your attention, if you will, again to the Gastonia unit, and to the drawing, in connection with the HVAC.

And page M–1, I believe, and ask you, looking at the two of the five units that you testified to a little bit earlier this afternoon, noting that three of them are colored in yellow, and the other colored in pink, you describe one as being not related to the operation of the building; and the other two being related to the operation of the building.

Would you describe, in general, why the pink ones are related to the operation of the building as such, as separate, or distin-

guish those that are related, from not related?

A What you have in this facility, it's a retail facility. In any building that is going to be used in some form of retail environment, you have to have heating included.

It isn't required to make the building work. But relative to your people that would be occupying the building, you need some form of air conditioning.

And let me explain, that the word air conditioning does not necessarily mean cooling of air only. It also means removing humidification from the air. It's a combination of the two.

On this particular facility, you have five roof top air conditioning units, each of which is a five ton unit. So you have 25 tons of cooling in this particular facility.

The overall size of the building is just over 3000 square feet, which equates to about 150 square feet per ton. So what you are ending up with is an abnormally large amount or volume of air conditioning for a building of this size.

In analyzing this, we wanted to make sure that we were not going to strip out of this building all of the air conditioning, such that there was not any air conditioning to make this building work as a building, because there is a fine line when you define the word "building", and when you define something that is related to some equipment.

If you stripped everything out, all the air conditioning out of here, and said we're going to take the whole air conditioning system that is related to the equipment, you obviously would have no heating, ventilating, air conditioning in the building.

So as a sounding board, during the course of the examination of these blueprints, to make a determination as to whether our thought process was going in the right direction we looked down and said, we have units four and five, which are five tons each, and we have a portion of unit number one, which is some percentage.

In this case, I am just going to take a stab and say it is somewhere between ten and 20 percent, based upon the air volumes.

That you have about 11 tons, 12 tons of air conditioning left in this building, after we take out units two and three, and reduce the size of unit number one, which would mean then that you end up with about 400 square feet per ton.

And as a retail establishment, that falls within acceptable guidelines for air conditioning.

If you were going to convert this to an office building, you might want a little more air conditioning, because you have a higher density of people in there.

Retail establishments don't have the same density patterns of people. The same people aren't in there all day long. Office buildings you have people in there all day long and therefore you build up that heat from the people.

So that was used as an acid test in doing this, to make sure we weren't stripping this building of its ability to function as a building.

Now you may relocate one of units four or five to a more central location, and put it over where unit three is, if you were going to convert this to some other retail establishment. Or you may say, on unit one, instead of a five ton unit, we only need a one or two ton unit back there.

But essentially, you could just take the components that are here, and just move unit five over to where unit two or three was, and this building would work as a building.

Ms. Power, counsel for the plaintiff, elicited further testimony on direct examination from Dennis Bost, as follows:

[MS. POWER]

Q And, they are used—let's move to the HVAC. Can you describe the HVAC system in a Hardee's unit? Boddie–Noell unit.

[MR. BOST]

A Yes. They consist of heating and cooling units on the restaurant roof. It could have been either a gas back or electrical—certain tonnage. Also, in addition to providing—and I think Mr. Hamilton pointed this out, air conditioning means heating and cooling. In addition to that, we have a ventilating system. A series of hoods, exhaust fans, make up air fans up on the roof.

Q Why do you have a ventilating system?

A Well, again, code requires that you capture and contain all the contaminated area in a restaurant and that you exhaust that to the outside.

Q Why would the code require that?

A Just from the standpoint of, I guess, good air. Health reasons.

Q Where is your ventilating system? Did you describe it a make up air system?

A Well, generally, each unit has a supply and return. But, in the food preparation area, you specifically have—located near the hoods that capture the exhaust fumes, you will have the make up air fans up on the roof that provide air back to that same space.

Q Could you describe exactly what make up air does?

A I think if you will look on the plan that there is not an air duct scheduled on this HVAC plans, but what you are doing, you basically have—supply, a certain amount of CFM, cubic feet per minute, supply into the restaurant through each unit.

For example, I believe a 5 ton unit is the total of 2,000 CFM. In general, each HVAC plan would show the CFM at each diffusion. The return, because of static pressure, the return CFM is not as great. So, consequently you have to provide to keep a balanced system equilibrium principle of that. You have to provide outside fresh air, someway. That generally comes in through dabbers through the units.

In addition to that, you have an exhaust system that is exhausting a certain amount of air out of the restaurant. Again, its CFM capacity is indicated on the plans, if I am not mistaken. So, you are taking air out of the restaurant if you assume it is in balance, you have to provide air back into

it. The purpose of that entire system is to prevent contaminated air from being filtered throughout the restaurant.

Q Can you give us an idea of the volume of air that is being exhausted out?

\* \* \* \* \* \*

MR. BOST: I could look specifically at the plan, but I think generally on such as a flat grill hood, or whatever you look at anywhere from 1800—excuse me—800 to 1600 CFM. We could go directly to the HVAC plan and see what the specs call for as far as CFM.

BY MS. POWER:

Q And that would be replaced by the makeup air?

A You have to provide some type of other air back into the restaurant. The general principle behind what you are trying to do is to keep what they refer to as negative pressure in the kitchen. That means that in theory, you would like not to have any contaminants get out from underneath your hood. That is in theory.

Once you crank up a fully open restaurant for product cooking and so forth, that may not happen. So, you have to provide some way to exhaust that and the make up air. You want to keep a little bit of negative pressure to make sure that you always have the exhaust going out of the hood. These are referred to as short cycle hoods, the ones we use today.

Q What do you mean by short cycle hood?

A The make up air is contained within the hood.

Q What is the hood?

A The hood is directly over the cooking apparatus that has the exhaust fan located above that, on the roof. In addition to that, and I thought I would just go on, if you try to keep a negative pressure inside the food preparation area, you want to keep an overall what they refer to as positive pressure on the building, such that if you open the doors to the restaurant that contaminated air would go out the door. You would not want contaminated or untreated air coming back into the restaurant. If it is in the kitchen, you want it going out of the exhaust?

Q Could you describe what you mean by contaminated air?

A Grease laden air, air that comes from the biscuit making operation, just contaminated air that is again, environmentally not good for employees. Over long periods of time, could build up on equipment.

Q How much air conditioning tonnage is there in Boddie–Noell?

A Today, or on one of these particular units?

Q On these particular—no, both.

A Today we use, I think, a total of about 22 to 23 tons, 10.5 ton unit in the food preparation area, a 5 ton unit located over the sales counter area, and a 7 ton unit over the dining room area. I believe that is 22.5 tons.

Q And these units?

A Well, I believe it was indicated, that it could be anywhere from 4 to 5 ton units. I believe there was one unit, if I am not mistaken, that did have a 7.5 ton unit that was in back of food preparation.

Q And total tonnage?

A Again, anywhere from 20 to 25 tons.

Q And, what was the breakdown, again, between the kitchen area and the dining area?

A For these particular units. As I recall where the unit was located, basically had a unit—a 5 ton unit, located in the back of—I believe there is one plan with a 7.5 ton unit. Then, a 5 ton unit located over the sales area that had a combination of serving not only the food preparation—I think there were two diffusers off of that to the food preparation area. But, also the sales counter and the restrooms. So, probably a total of about a little over 6 or 7—right at 6 or 7 tons—you would have to look at the CFM, or whatever. But, not as great as we had today, obviously.

Q What is the size of the kitchen area?

A They vary.

Q What is the size of the total restaurant?

A The units vary, anywhere from 2500 to 3800 square feet, if I am not mistaken. I think the basic dimensions are something like 37 by 70 something feet. You just have to multiply it out. I have not memorized them, or whatever. I think on the 22, and this is—I think the plan represents the food preparation area as 23 foot wide on that plan, or 22 foot wide. And, just not counting the frozen cooler space, if you just look from the sales counter back, I think, it is generally something like 22 by 30. It could range anywhere from especially on the ten, I believe, which was a little bit larger building. It could range anywhere from 600, 700 to 1,000 square feet.

Q What type of considerations go into designing the HVAC system?

MR. FRAHM: Your Honor, I object. He has not been qualified as an HVAC expert.

MS. POWER: For the Boddie–Noell units.

MR. FRAHM: He has not been qualified as an expert in the design of the HVAC units generally, or for the Boddie–Noell units.

THE COURT: I will allow him to answer for the Boddie–Noell unit simply because of his position at Boddie–Noell and the responsibilities that he has. So, if the question is limited to Boddie–Noell units, your answer should be so limited as well, Mr. Bost.

MR. BOST: Could you repeat the question, please?

BY MS. POWER:

Q What type of considerations go into the design of the Boddie–Noell HVAC system?

A Basically, what I have just described to you. You have a certain area that—the restaurant generates heat, the building generates heat, the equipment generates heat, people generate heat, the lights, and so forth. So, basically you are looking for design that is sufficiently zoned and energy efficient, and most importantly, cost efficient from terms of purchasing equipment and installation.

\* \* \* \* \* \*

Q Can you describe how the HVAC system is designed in the equipment area?

\* \* \* \* \* \*

MR. BOST: Our consultants who design the restaurant approach it the same way. They have to calculate the heat that is generated in the restaurant in the area that they want to try to cool, and select the units basically for that. Also, in the food preparation, take into consideration the exhaust of the ventilating capacities that we are trying to achieve in that area. That is a quick overview.

The testimony of Mr. Bost was ineffective in persuading this court that the HVAC systems at issue in the above-captioned case could be characterized in accordance with the standards set forth in the regulations and addressed at length in the *Publix* case to consider the plaintiff's HVAC systems eligible for the investment tax credit. Indeed, the plaintiff fails to establish that the HVAC systems at issue in the above captioned case were required solely to meet temperature or humidity requirements essential for the operation of kitchen machinery, or the processing of materials or foodstuffs. Pursuant to Treasury Regulation § 1.48–1(e)(2), as it was interpreted by the IRS in 1978 and 1979, the testimony offered by Mr. Hamilton and Mr. Bost of the seemingly more than incidental benefits derived from the HVAC system by employees and customers preclude granting a tax credit under the "sole justification" test of those regulations. Thus, plaintiff was unable to meet its burden of proof to show that the HVAC systems at issue fall within the sole justification exception and, therefore, are eligible for the tax credit.

In contrast, defendant, on direct examination, presented the far more cogent testimony of Lawrence Gaffney. Mr. Gaffney, who appeared as an expert for the defendant, testified that the purpose of the HVAC systems in the instant case was to provide for comfort and temperature maintenance for the benefit of employees in the kitchen area:

[MR. FRAHM]

Q Okay. Let's move on to the HVAC system, have you also studied the blueprints concerning the HVAC system?

[MR. GAFFNEY]

A Yes.

Q And are you aware of what Boddie–Noell design criteria was for their HVAC system?

A Yes, I am.

Q Can you describe what that design criteria was as you understand it and how you came to know of that?

A I was given a document by you that was obtained, as I understand, during discovery. And on there it gave some design criteria. The design criteria for these restaurants.

Q And what was that if you can describe it generally?

A Well, the main criteria was in relation to the outside area intake which they make up there, and also for the heat gain calculations for cool—Well, for the heat and gain and loss calculations through the walls and through the building envelope. And when you make calculations you have to have design calculation—design criteria. And one of the design criteria is to have the outside air temperature and the inside air temperature.

And on is that sheet of paper, it said 95 degrees outside 75 and in some cases 78, depending on the criteria, 75 to 78 degrees Fahrenheit on the inside. So is that would be a critical piece of information for the design of the system.

Q Okay. So, were you able to reach any conclusions concerning the design and function of the HVAC system given your review of the blueprints and this design criteria?

A Excuse me, I lost the bubble.

Q Well, why don't you, if you will, just describe the HVAC system as you understand it from the blueprints?

A Okay, the way—it depends on the unit.

Q All right. Okay, explain as you see fit?

A There was—it depends on where certain—depends on the size of the unit and whatever calculations were made there were four or five roof top units.

Q Okay.

A As a rule, as I remember it the seating area usually involved two of these units, and the what would be called the—I guess the starting of the serving area and the kitchen area and the kitchen operational area it's called. Usually it had either two or three units, roof top units, as I recall to the best of my ability.

Q All right. And how were those HVAC units installed? You mentioned that they were on the roof, how would they be installed?

A They are installed with what we would call a self-contained unit. It—it's one unit that has the heating and cooling in one unit with its own compressor. And it sits on the roof on a curved, on a curved opening. It then has a supply and a return air up inlet. It points down through the roof. And at that point you hook duct work on.

It can be, as I remember, some of them are what is called concentric, where they have the supply and return cone one within the other, one set of duct work, or it might just have using the ceiling as a return air plenum, as we call it, box. You would have that opening looking down, opening into the ceiling. Then your supply duct would be ducted through the ceiling to distribute the air throughout the space, whether it be the dining room, or the kitchen or whatever it is, to distribute it fairly evenly, uniformly throughout this space. That is what I remember the drawings showing.

Q Okay. Can you describe or do you have any opinions about the function of the HVAC units that serve the dining room areas in restaurants. What function would they be serving? What functions?

A They would serve the normal function of the heating, ventilating, air-conditioning. They would be serving the needs of that particular space which is—I suppose most critical, the comfort of the customers and also—they also provide the needed make up air and ventilation air required by code.

Q All right. What about the H.V.A.C. units that serve the kitchen area, what purpose or purposes do they serve?

A Well, they serve a similar purpose.

Q Similar to what?

A The dining room.

Q All right. Could you elaborate?

A The—well again—they also bring in and condition the air required for make up to the hoods and the ventilation which is minor in the kitchen compared to the—the codes require that you bring in so much out side air for ventilation for people purposes. There are fewer people in there so that the make up air going through those units is also to supply make up air to the exhaust hoods that are in there to capture heat and to take it out.

Okay. That's one function. And obviously the other function is to keep the workers happy. And that's—.

Q All right. Now, can you tell anything from the design of the kitchen system in particular that indicates what the principle purpose, if there was a principle purpose, was in designing the system. You mentioned that it served the purpose of the body make up air, you've also said that it keeps the workers happy?

A Yeah. As I said, it serves two purposes. But if it was—we run into this with clients on these kind of restaurants. We ask for the design criteria. And in the old days—not so old, I guess. We used to—they wanted to save some money, so we used to—at that time they didn't want to air condition their kitchens. But you had to the put at least some cooling in and to take—to dissipate the heat that was coming off the equipment. We used to try—and we did in the old days. We took the air from the seating capacity and ran it through the kitchen as secondary air and was able to balance out against some of the heat. But that—that allowed it to elevate to maybe 85 degrees or something like that. We could only do secondary cooling. The industry has changed. In order to keep employees, we kept the criteria to air condition the kitchen to suit the employees. So to that extent, it goes beyond just

cooling to take care of you know—it goes beyond what we used to do.

Now the—I don't know what else I can say. It's now air conditioned just like any other space.

Q And you said—you were talking about the design criteria that you are given today generally. What about the design criteria that you saw here, what does that indicate in terms of Boddie–Noell's particular purposes in installing various HVAC units in the kitchens?

A The—well, given the criteria of 75 or 78 degrees, room temperature in the kitchen, the kitchen prep and the kitchen area, a person would have to take into account—that to me indicates that they are trying to keep people happy. You can't—it also takes into account that in doing that you have to allow—you have to balanced against the heat that is dissipating from the kitchen equipment.

Based upon a review of the testimony of plaintiff's expert witness, George Hamilton, plaintiff's witness, Dennis Bost, and defendant's expert witness, Lawrence Gaffney, and a review of the record, this court concludes that plaintiff has failed to meet the burden of showing that the Commissioner erred in determining that plaintiff's investment tax credit claims for the HVAC systems in each of the restaurant units at issue in the instant case were not eligible for the investment credit. Moreover, even under the expansionist tests for eligibility discussed above, plaintiff's claims for credit should be denied.

*Decorative Mirror FYE 1978*

█ Plaintiff also asserts an investment tax credit claim for FYE 1978 for a Decorative Mirror in the Mercury Blvd.—Unit 2611 in the amount of $59.12. The parties have stipulated to plaintiff's possession of invoices to substantiate the cost of this item. The invoice is in the record and the item was identified in the memoranda attached to plaintiff's Amended United States Corporation Income Tax Return for FYE 1978. Although the IRS was provided actual notice regarding this claim, and the invoice is in the record, the plaintiff failed to introduce evidence at trial or to discuss the item in its post-trial brief in order to establish when the

mirror was "placed in service." Therefore, the plaintiff has not met its burden of rebutting the prescription of correctness accorded to the Commissioner. Plaintiff's claim for refund with respect to its asserted investment tax credit for FYE 1978 for a Decorative Mirror at Mercury Boulevard—Unit 2611 must be denied.

*Carousel Window Units*

In addition, plaintiff claims entitlement to a refund for the 1979 tax year based upon expenditures for carousel units, which plaintiff contends constituted section 38 property eligible for the investment tax credit, and includes the following:

FYE 79

| UNIT | ITEM | AMOUNT |
|------|------|--------|
| Gastonia—Unit 1051 | Carousel Unit | $1,141.56 |
| Lexington—Unit 1090 | Carousel Unit | $1,183.68 |
| Rockford Street—Unit 1381 | Carousel Unit | $1,034.00 |
| Hwy. 301 South—Unit 1461 | Carousel Unit | $ 957.48 |
| Maple Avenue—Unit 1521 | Carousel Unit | $1,090.00 |
| Bessemer City—Unit 1531 | Carousel Unit | $1,203.24 |
| Martinsville—Unit 2030 | Carousel Unit | $1,141.00 |
| Martinsville East—Unit 2171 | Carousel Unit | $1,635.00 |
| Crater Road—Unit 2441 | Carousel Unit | $1,062.00 |
| Hickory Point—Unit 2581 | Carousel Unit | $1,047.00 |
| Mercury Blvd.—Unit 2611 | Carousel Unit | $1,042.00 |
| Fairfield—Unit 2631 | Carousel Unit | $1,041.00 |
| Lumberton # 2—Unit 1291 | Carousel Unit | $1,382.59 |

Plaintiff asserts, generally, that the carousel drive-up window units were installed "only for reasons related to Plaintiff's business, [and] as such are accessorial to the business, and tangible personal property." On cross-examination by defendant's counsel, however, the following testimony was elicited from plaintiff's expert witness, Mr. Bost:

[MR. FRAHM]

Q Boddie–Noell has installed revolving carousel windows and sliding windows—

[MR. BOST]

A That's correct.

Q In its units and the windows were installed in a rough in opening that's about two feet by four feet?

A That's approximate.

Sometimes the window unit could come as one large piece as it does now.

Q And so far as you know the carousel units are standard manufactured items?

A That's correct.

Q Not custom—

A Ready metal carousel type ones, all designations of type window.

Q The same thing is true for the track window: standard manufacture—

A That's right.

Q And they are installed just like any other window?

A Well, they have a little, in terms of the newer ones, they have a little bit more requirements and, in fact—

Q Let's limit your testimony to the ones that were installed during the years at issue if you know.

A All right, carousel I would imagine that there is a mechanism in there that you have to be very careful for, but they're not similar to the glass remainder of the glass in the restaurant.

It's a whole different design: a brick metal design.

Q My question was whether they were installed the same way as other windows and your answer seems to be that so far as you know yes.

A Did somebody physically have to pick them up and put them there, yes sir.

Q I'm talking about not just the manner of picking them up, but the manner in which they are fixed.

THE COURT: I don't think that's what he said, Mr. Frahm.

Why don't you go back and ask him some questions rather than testify for him?

MR. BOST: I'm not sure, I mean other than yes, they have to be installed, but it is a different piece of equipment that you are installing.

Upon further cross-examination, plaintiff's expert also stated the following as to the character of the carousel windows:

[MR. FRAHM]

Q It's a different piece of equipment?

[MR. BOST]

A That's correct.

Q But, it's installed in largely the same manner as windows would be installed?

A It has to be secured in place and this a piece of equipment that, especially in

these years if I'm not mistaken it was supplied by Boddie–Noell out of its warehouse.

Q So it's secured in place?

A That's correct.

Q And both types can be locked, correct?

A There should be a locking mechanism on them, yes.

I'm sure there was.

Q Both the carousel and the track window units then perform the building function of keeping out the elements, don't they?

A In serving the customers through the drive-up window.

Q And serving the customer?

A Right.

Q But they also keep out the elements which is a building function, correct?

A We'd like to think they keep it out sometimes, but the bottom line is when you open that window you're either going to have air coming in or air going out.

Q Okay, how about the front door, that helps you serve customers too, doesn't it?

A That's correct.

Q And it serves a building function too: it keeps out the elements, doesn't it?

A Not in the same regard.

People don't have to get out of their car to go through the drive through window.

Q But it keeps out the elements when the door is closed, right?

A That's correct.

Q And when it is open it does not?

A That's correct.

Q That's all the questions I have, Your Honor.

In order to determine if the carousel window units are tangible personal property and thus subject to the section 38 investment tax credit, the court looks to the definition of tangible personal property as set forth in Treas.Reg. § 1.48–1(c): "For purposes of this section, the term 'tangible personal property' means any tangible property except land and improvements thereto, such as buildings or other inherently permanent structures (including items which are structural components of such buildings or structures)." Treas.Reg. § 1.48–1(c). To the extent the carousel window is properly characterized as a "structural component," it is not creditable. "Structural component" is defined in Treas.Reg. § 1.48–1(e) as including "such parts of a building as walls, partitions, floors, and ceilings, as well as any permanent coverings therefore such as paneling or tiling; windows and doors; . . . ." Treas.Reg. § 1.48–1(e)(2). In addition to the specific reference in the Treasury Regulation to "windows" as noncreditable structural components, the court notes that the function of the carousel windows is consistent with that of a "structural component" as defined by Treas.Reg. § 1.48–1(e)(1). Indeed, the testimony of Mr. Bost, the expert designated by plaintiff, reflects that in addition to assisting in serving customers at the drive-up, the carousel windows serve the essential building function of keeping out the elements. Thus, based upon the limited testimony in the record on this issue, the court concludes that the essential character of the carousel windows is that of a structural component. The expenditures for carousel windows for which plaintiff seeks investment tax credit treatment and a subsequent refund, therefore, are not creditable. Plaintiff's claim for refund for these items, therefore, is denied.

## CONCLUSION

For the reasons discussed more fully above, this court finds that based on the plaintiff's failure to present sufficient documentary evidence and testimony during the trial, and after applying the relevant statutory, regulatory, and case law, the plaintiff has not proven that it is eligible for investment tax credits as claimed. Plaintiff also has failed to properly substantiate the amounts claimed. Consequently, the plaintiff's request for a tax refund is **DENIED**. Judgment is entered for the defendant.

**IT IS SO ORDERED.**